## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 25 2017, 6:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kenneth Lee Neville, Jr.,<br>*Appellant-Defendant/Cross-Appellee,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff/Cross-Appellant.* | July 25, 2017<br><br>Court of Appeals Case No.<br>49A02-1606-CR-1447<br><br>Appeal from the<br>Marion Superior Court<br><br>The Honorable<br>James Kevin Snyder,<br>Judge Pro Tempore<br><br>Trial Court Cause No.<br>49G20-1410-F3-49424 |

**Kirsch, Judge.**

Following a jury trial, Kenneth Lee Neville, Jr. ("Neville") was convicted of Level 3 felony dealing in a narcotic drug,[1] Level 4 felony unlawful possession of a firearm by a serious violent felon,[2] Level 5 felony possession of a narcotic drug,[3] and Class C misdemeanor operating a motor vehicle without ever receiving a license,[4] and he was adjudicated to be a habitual offender.[5] The trial court vacated Neville's convictions for unlawful possession of a firearm by a serious violent felon and for possession of a narcotic drug based on double jeopardy concerns. Neville appeals and raises the following two restated issues:

> I. Whether the trial court abused its discretion when it admitted evidence obtained during a traffic stop of a vehicle Neville was driving without a license; and

> II. Whether the State presented sufficient evidence to convict him of dealing in a narcotic drug.

The State cross-appeals and raises the following restated issue:

> III. Whether the trial court erred when it vacated Neville's conviction for unlawful possession of a firearm by a serious violent felon.

---

[1] *See* Ind. Code § 35-48-4-1(a)(2).

[2] *See* Ind. Code § 35-47-4-5(c).

[3] *See* Ind. Code 35-48-4-6(a).

[4] *See* Ind. Code § 9-24-18-1.

[5] *See* Ind. Code § 35-50-2-8.

We affirm.

## Facts and Procedural History

Around 7:30 p.m. on October 23, 2014, Indianapolis Metropolitan Police Department Detective Sergeant Brady Ball ("Detective Ball") was seated in his marked police vehicle, surveilling a home associated with an individual named Joey Milton ("Milton"), who was a person of interest in a homicide investigation. Detective Ball was parked several blocks away from the home and observed the home through binoculars. Detective Ball saw two men who generally fit Milton's physical description, along with a female and three children, get into a car parked in the driveway at the residence and drive away. Detective Ball followed the vehicle.

Detective Ball attempted to check the license plate of the vehicle, a Lincoln, but there was a tinted cover over the paper license plate, and he could not see the expiration date or some of the letters or numbers on the license plate due to the tinting and because it was nighttime and headlights bounced off the plate. At some point, Detective Ball's car was stopped behind the Lincoln at an intersection, and he attempted to run a computer search on what he thought were the letters and numbers on the Lincoln's license plate but found that he did not have the correct letters and numbers in his search. Because the license plate was not visible, Detective Ball initiated a traffic stop of the Lincoln, which pulled into a gas station, and Detective Ball pulled in behind it. Detective Ball exited his vehicle and when he was about five or six feet from the Lincoln, he could see the license plate and he radioed it to dispatch. He then walked to the

Lincoln and made contact with the driver, Neville, and noted to Neville and the occupants that he stopped the Lincoln because it had a tinted cover on the license plate, making it not visible. In the front passenger seat was Neville's girlfriend, Amanda Lee ("Lee"), and in the back seat was Milton, who is Neville's brother. Three minor children were also in the car.

[5] Detective Ball asked Neville for his driver's license, and Neville responded that he did not have one and had never applied for one, but he provided Detective Ball with an identification card. Detective Ball learned that Lee and Milton also did not possess a driver's license. Neville and Lee told Detective Ball that the car belonged to Lee. Lee explained that she had purchased the car recently and that it had come from the dealer with the tinted plate cover. Detective Ball asked Neville to step out of the vehicle. Detective Ball showed Neville the tinted plate cover, and at Detective Ball's instruction, Neville sat on the back bumper of the Lincoln as Detective Neville returned to his police vehicle.

[6] Detective Ball conducted a search on the information he had received and confirmed that Neville never had a license and that Milton was the person that the Violent Crimes Unit was investigating for a homicide. Detective Ball confirmed that the license plate belonged to a vehicle owned by Lee and was registered to her at the address Detective Ball had been surveilling. Detective Ball asked for backup officers.

[7]    After backup officers arrived, Detective Ball handcuffed Neville's hands behind his back.[6]  In the process of removing items from Neville's pockets, Detective Ball felt the exterior of Neville's pants in the pockets and crotch area, and he detected lumps that Detective Ball believed to be "dope."  *Tr. Vol. III* at 703; *State's Ex.* 2 at 16:03.  After advising Neville that he was going to retrieve the lumps that he had felt, Detective Ball reached down the front of Neville's pants and pulled from under his scrotum area and in his underwear a package of what he at that time believed to be a package of cocaine and a package of heroin. During this time, Neville protested that Detective Ball was in his pants, and stated that he felt violated and that Detective Ball was violating his constitutional rights.  Neville suggested that Detective Ball had no authority to search him and asked repeatedly why it was necessary for Detective Ball to touch him, stating, "You stopped me for driving."  Detective Ball replied, "I did, and I'm arresting you for driving."  *State's Ex.* 2 at 18:36.

[8]    Detective Ball placed the narcotics on the trunk of the Lincoln, and he then looked inside the vehicle and popped open an armrest on the driver's side door and found a loaded handgun.  Neville told Detective Ball that it was not his car, and he did not know the gun was there.  Detective Ball told Neville, "You're going to jail," read him his Miranda rights, and told Neville that he was under

---

[6] At or near this time, other officers removed Milton from the car and handcuffed him.

arrest. *Id*. at 23:33-24:47. Neville's wallet contained $1,243 in cash. Police seized the cash and towed the vehicle.

[9] In October 2014, the State charged Neville with Count I, dealing in a narcotic drug while in possession of a firearm, a Level 3 felony; Count II, unlawful possession of a firearm by a serious violent felon, a Level 4 felony; Count III, possession of a narcotic drug and a firearm, a Level 5 felony; and Count IV, operating a motor vehicle without ever receiving a license, a Class C misdemeanor. In March 2016, the State added a habitual offender count.

[10] In March 2016, Neville filed a Motion to Suppress – Traffic Stop ("Motion to Suppress"), alleging that the traffic stop violated his rights under the Fourth Amendment and Article I, Section 11 of the Indiana Constitution.[7] Neville contended that the search of his person and the vehicle were not valid because (1) the stop was not valid, and (2) he was not arrested until after the searches, so the searches were not incident to his arrest.

[11] At a hearing on the Motion to Suppress, Detective Ball acknowledged that the traffic stop was "pretextual" and was related to the residence, as he had been surveilling the home and watched the two men get in the vehicle and leave. *Tr. Vol. III*. at 689. He also testified that the license plate had a tinted cover, it was dark outside, and he could not read the license plate until he was out of his vehicle and standing five or six feet from it at the gas station. He testified that

---

[7] Neville also filed a Motion to Suppress Statements, which he later withdrew.

Neville was driving the car, that he did not have, and had never had, a driver's license, and that no adult in the car had a driver's license. Detective Ball testified that after getting Neville's identification, he returned to his police car and called dispatch with the information. He stated that he decided to arrest Neville for operating a motor vehicle without a license, and he requested back up assistance.

[12] During Detective Ball's testimony at the hearing, the State presented an audio recording of the traffic stop, taken by Detective Ball (the Audio Recording"). *State's Ex*. 2. When the assisting officers arrived, Detective Ball can be heard telling them that Neville was "arrestable" and that he intended to "hook him up," meaning arrest him, to gain access to the car. *State's Ex*. 2 at 14:39-42; *Tr. Vol. III* at 743. Detective Ball can be heard instructing Neville to face the Lincoln and place his hands on the truck, and handcuffing sounds are audible. Detective Ball stated that he felt lumps, not part of Neville's body, and he advised Neville that he was going to retrieve what he felt. The tape reveals Neville's repeated protests of Detective Ball's search of him and Detective Ball's responses. Later, Detective Ball told Lee that her car was going to be towed, and Lee stated that she did not know about the drugs or the handgun and that they did not belong to her.

[13] Detective Ball testified that, in searching Neville, he reached down the front of Neville's pants, not the back of Neville's pants as Neville alleged, and he retrieved the bag of what he believed to be narcotics and placed them on the trunk of the Lincoln. He then looked in the Lincoln and found inside the

driver's side door armrest a handgun. He told Neville that he was under arrest and read the *Miranda* rights to him.

[14] Defense called several witnesses at the hearing: Lee; Neville's sister, Kentia Neville ("Kentia"), who arrived at the scene during the search, and Neville. Lee videotaped with her cell phone some of the search, which happened at the back of the Lincoln, from her position in the front seat of the car. That video was admitted into evidence over the State's objection. *Defense Ex*. C. Kentia testified that she saw Neville being searched when she arrived at the gas station.

[15] The trial court issued an order, denying the motion to suppress:

> 1. The Defendant was stopped and detained as a result of a valid traffic stop on October 23, 2014.
>
> 2. Detective Sergeant Brady Ball followed a tan Lincoln vehicle driven by Defendant and attempted to run the temporary paper plate affixed to the rear of the vehicle; however, Detective Sergeant Ball, who testified under oath, was unable to read the numbers or expiration date on the paper plate due to a tinted plate cover obstructing his view.
>
> 3. That this obstruction violated I.C. 9-18-2-26 and gave Detective Sergeant Ball a valid reason to stop the vehicle, despite the admitted pretextual nature of the stop.
>
> 4. Despite the absence of averments in Defendant's Motion to Suppress-Traffic Stop alleging an unlawful search of Defendant's person, the parties agreed to hear further evidence during the May 17, 2016, hearing as to the validity of the search of Defendant's person following the traffic stop.

5. Upon validly stopping the tan Lincoln, the Defendant was found in the driver's seat and had never received a driver's license; this gave Detective Sergeant Ball probable cause to arrest Defendant for a crime.

6. Therefore, the subsequent search of Defendant's person was lawful incident to his arrest for that crime.

7. Thus, any and all items seized from the Defendant's person are admissible into evidence.

*Appellant's App. Vol. II* at 91-92. The trial court also denied Neville's motion to reconsider.

[16] Neville re-asserted his motion to suppress Neville's statements prior to the start of trial. During the course of trial, Neville objected to the admission of evidence arising from the alleged illegal traffic stop and unconstitutional searches. The trial court overruled the objections and renewed its denial of the motion to suppress evidence from the traffic stop. *Tr. Vol. I* at 171. When the State attempted to introduce the gun found during the search of the Lincoln, the trial court conducted a supplemental suppression hearing outside the presence of the jury, and the trial court again denied Neville's motion to suppress. *Tr. Vol. II* at 276, 303.

[17] Forensic testimony was presented that the bags retrieved from Neville during the traffic stop contained 4.16 grams of heroin and 24.29 grams of Doxylamine, an anti-histamine that is often used to "cut" controlled substances. *Tr. Vol. I* at

220-21, 229; *Tr. Vol. II* at 350-51; *State's Exs.* 16, 17, 18.  Neville's DNA was found on the gun.  *Tr. Vol. II* at 396.

[18] The jury found Neville guilty on Counts I through IV.  Neville waived his right to have a jury determine his status as a serious violent felon and habitual offender.  After hearing evidence, the trial court found Neville to be a serious violent felon and a habitual offender.  Based on the jury's finding that Neville unlawfully possessed a firearm, the trial court found Neville committed possession of a firearm by a serious violent felon.  *Tr. Vol. III* at 615.  At the sentencing hearing, the trial court vacated the conviction for possession of a firearm by a serious violent felon, due to double jeopardy concerns.[8]  *Id.* at 671; *Appellant's App. Vol. II* at 22-25.  It imposed an eleven-year sentence for dealing in a narcotic drug, enhanced by ten years for the habitual offender finding, and a concurrent sixty-day sentence for operating a vehicle without ever receiving a license.  Neville now appeals.

## Discussion and Decision

## I.  Admissibility of Evidence

[19] Neville claims that the traffic stop and ensuing searches violated his federal and state constitutional rights and that the trial court erred when it denied his motion to suppress and, thereafter, admitted into evidence the items found

---

[8] The trial court also vacated Neville's conviction for possession of a narcotic drug, as a lesser-included offense of the dealing conviction.  *Tr. Vol. III* at 671.  The trial court's decision to vacate the possession conviction is not at issue in this appeal.

during the searches. Because Neville's case proceeded to trial, where he renewed his objection to the admissibility of the seized evidence, his appeal "is better framed as a request to review the trial court's ruling on its admissibility." *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014). A trial court has broad discretion to rule on the admissibility of the evidence. *Jarrell v. State*, 818 N.E.2d 88, 91 (Ind. Ct. App. 2004), *trans. denied*. We review its rulings "for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances, and the error affects a party's substantial rights." *Guilmette*, 14 N.E.3d at 40. When an appellant's challenge to such a ruling is predicated on an argument that impugns the constitutionality of the search or seizure of the evidence, it raises a question of law, and we consider that question de novo. *Id.* at 40-41 (citing *Kelly v. State,* 997 N.E.2d 1045, 1050 (Ind. 2013)).

[20] Neville claims that the traffic stop was illegal and that all evidence arising from that stop was inadmissible, and "[e]ven if the traffic stop was not illegal, the searches and seizures were." *Appellant's Br.* at 17. He raises claims under the Fourth Amendment and Article I, Section 11 of the Indiana Constitution. The purpose of the Fourth Amendment is to protect the privacy and property interests of individuals from unreasonable searches and seizures. *Rush v. State*, 881 N.E.2d 46, 50 (Ind. Ct. App. 2008). The protections of the Fourth Amendment have been extended to the states through the Fourteenth Amendment. *Wilson v. State*, 966 N.E.2d 1259, 1263 (Ind. Ct. App. 2012), *trans. denied*. Evidence obtained in violation of a defendant's Fourth

Amendment rights may not be introduced against him at trial. *Id.* A traffic stop is a seizure under the Fourth Amendment, so police must possess reasonable suspicion that a traffic law has been violated or other criminal activity is taking place. *Finger v. State*, 799 N.E.2d 528, 532 (Ind. 2003). Generally, a search or seizure may only be conducted pursuant to a lawful warrant. *Wilson*, 966 N.E.2d at 1263. Because warrantless searches are per se unreasonable, the State bears the burden of establishing that a warrantless search falls within one of the well-delineated exceptions to the warrant requirement. *Johnson v. State,* 766 N.E.2d 426, 432 (Ind. Ct. App. 2002), *trans. denied.* A search incident to arrest is one such exception. *Black v. State*, 810 N.E.2d 713, 715 (Ind. 2004).

[21] Notwithstanding the textual similarity of Article I, Section 11 of the Indiana Constitution to that of the federal Fourth Amendment, Section 11 is interpreted separately and independently from Fourth Amendment jurisprudence. *State v. Washington*, 898 N.E.2d 1200, 1205-06 (Ind. 2008). Our Supreme Court has explained:

> The purpose of [Section 11] is to protect those areas of life that Hoosiers consider private from unreasonable police activity. The Indiana Constitution may protect searches that the federal Constitution does not. Section 11 should be applied to protect people from unreasonable search and seizure. When police conduct is challenged as violating this section, the burden is on the State to show that the search was reasonable under the totality of the circumstances. The determination of the reasonableness of a search and seizure under the Indiana Constitution turns on a balance of: 1) the degree of concern,

suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.

*Id.* (citations and quotation omitted).

### *A. Traffic Stop*

[22] Indiana Code section 9-18-2-26 requires license plates to be displayed in a position so as to be "clearly visible," "maintained free from foreign materials and in a condition to be clearly legible," and "not obstructed or obscured by . . . accessories, or other opaque objects." Ind. Code § 9-18-2-26(b)(3)-(5). Indiana Code section 9-32-6-11(f) imposes the same requirements on temporary license plates.

[23] Detective Ball testified that he followed the Lincoln for a mile or more to the gas station and could not clearly see the letters and numbers and the expiration date on the plate due to the tinted plate cover, which no one disputes was on the Lincoln. Detective Ball stated that at one point he attempted to conduct a license plate search, somewhat guessing at the letters or numbers, but the search was unsuccessful, since he did not have the correct information. The record before us indicates that the tinted cover of the Lincoln's license plate contravened the requirements of Indiana Code section 9-18-2-26. Therefore, Detective Ball was entitled to stop the Lincoln. *See State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006) (police officers may stop vehicle when they observe minor traffic violations).

Neville contends that the traffic stop was illegal because, although Detective Ball stopped the vehicle for the tinted plate, his stop was pretextual, as his intention was to stop the vehicle and speak to Milton, who was being investigated for homicide. As Neville, acknowledges, pretextual stops are not per se unreasonable, but are subject to greater scrutiny. *See Turner v. State*, 862 N.E.2d 695, 700 (Ind. Ct. App. 2007). Neville's claim, at its core, is that Detective Ball's testimony, regarding his inability to view the plate's information, was not credible. Neville notes that Detective Ball acknowledged that he could read the plate when he was out of his vehicle and walking to the Lincoln and that a picture taken by the evidence technician at the scene, admitted as Defendant's Exhibit A, illustrates that the plate was visible. However, both of those circumstances are from the vantage point of a person standing five or so feet from the car, and thus not the same conditions as Detective Ball, or anyone else, driving behind the Lincoln. Neville also suggests that Detective Ball was not credible, given that he conceded that he was surveilling the house and followed the car intending to stop it if he saw a traffic violation, in order to speak to Milton. Neville's arguments are a request for us to reweigh the evidence, which we may not do on appeal. *Lundquist v. State*, 834 N.E.2d 1061, 1067 (Ind. Ct. App. 2005). Furthermore, our courts have recognized that there is "nothing unreasonable in permitting an officer, who may have knowledge or suspicion of unrelated criminal activity . . . to nevertheless respond to an observed traffic violation." *Mitchell v. State*, 745 N.E.2d 775, 787 (Ind. 2001); *see also Herron v. State*, 991 N.E.2d 165, 170-71 (Ind. Ct. App. 2013) (officers are permitted to stop vehicle when they observe

traffic infraction, even if officers have independent motive of furthering unrelated criminal investigation), *trans. denied*; *Jackson v. State*, 785 N.E.2d 615, 619 (Ind. Ct. App. 2003) (if there is objectively justifiable reason for traffic stop then stop is valid "whether or not the police officer would have otherwise made the stop but for the ulterior suspicions or motives"), *trans. denied.* We find that, here, the traffic stop was constitutional under both the Fourth Amendment and Article I, Section 11.

### B. Searches

Neville next contends that even if the stop was valid, the search of Neville, and then the car, were not. He claims that the searches violated both the Fourth Amendment and Article I, Section 11 of the Indiana Constitution. We address each constitutional argument in turn.

Incident to a lawful arrest, police "may conduct a warrantless search of the arrestee's person." *Gibson v. State*, 733 N.E.2d 945, 953 (Ind. Ct. App. 2000). An arrest is lawful if it is supported by probable cause. *Fentress v. State*, 863 N.E.2d 420, 423 (Ind. Ct. App. 2007)). "The amount of evidence necessary to meet the probable cause requirement for a warrantless arrest incident to a lawful arrest, is determined on a case-by-case basis, and is less than the level of proof necessary to establish guilt beyond a reasonable doubt." *Ross v. State*, 844 N.E.2d 537, 542 (Ind. Ct. App. 2006).

Here, Neville does not deny that his act of driving without a license gave Detective Ball probable cause to arrest him for that offense. Rather, Neville's

claim is that Detective Ball did not arrest him until *after* Detective Ball had retrieved the drugs from Neville's underwear, and thus the search was not incident to his arrest. We disagree. Detective Ball handcuffed Neville, emptied Neville's pockets, and felt two large lumps in his groin that Detective Ball believed was not Neville's body, but was, instead, "dope." *Tr. Vol. III* at 703; *State's Ex.* 2 at 16:03. Detective Ball advised Neville, "I'm gonna get the dope out of your pants." *State's Ex.* 2 at 16:07. When Neville expressed to Detective Ball that he did not have the authority to retrieve the drugs, Detective Ball stated, "I'm arresting you for driving." *State's Ex.* 2 at 18:36.

[28] Neville notes that it was after taking the drugs from Neville's underwear and after finding the gun that Detective Ball told Neville, "You're going to jail," read *Miranda* rights to Neville, and stated "You're under arrest." *State's Ex.* 2 at 23:22-24:46. He argues that, therefore, Detective Ball did not arrest Neville until after he seized the items, and, consequently, the search was not incident to arrest, or, stated differently, the search preceded the arrest. However, the Audio Recording reveals that Detective Ball advised Neville that he was going to retrieve the drugs from Neville's pants, and in response to Neville's protests that Detective Ball did not have the authority to do so, Detective Ball told Neville, "I'm arresting you for driving." *State's Ex.* 2 at 18:36.

[29] Moreover, as Neville acknowledges, "[O]fficers do not need to inform an accused that he is under arrest for him to actually be under arrest[.]" *Appellant's Br.* at 28 (citing *Fentress*, 863 N.E.2d at 423). as "the determination of whether a defendant is under lawful arrest depends on whether the officer has probable

cause to arrest the person." *Appellant's Br.* at 28 (citing *Fentress*, 863 N.E.2d at 423). Under Indiana law, "'So long as probable cause exists to make an arrest, the fact that a suspect was not formally placed under arrest at the time of the search incident thereto will not invalidate the search.'" *Sebastian v. State*, 726 N.E.2d 827, 830 (Ind. Ct. App. 2000) (quoting *Santana v. State*, 679 N.E.2d 1355, 1360 (Ind. Ct. App. 1997)), *trans. denied*. Probable cause for an arrest exists if at the time of the arrest the officer has knowledge of facts and circumstances which would warrant a man of reasonable caution to believe the suspect has committed the criminal act in question. *Fentress*, 863 N.E.2d at 420. On appeal, Neville claims that he "was not under arrest at the time of the search of his person because no reasonable man would believe he had committed the traffic offense of which he had been accused." *Appellant's Br.* at 29. We are not persuaded, as it is undisputed that Neville was driving a vehicle with a tinted license plate cover, which Detective Ball testified prevented him from viewing the plate's information, and Neville was driving the car without ever having a license. Detective Ball had probable cause for an arrest, and although Neville suggests that Detective Ball's goal was to further investigate Milton regarding a murder, Detective Ball's subjective desire to do so does not invalidate Neville's arrest. We find Detective Ball's conduct was a valid search incident to arrest and did not violate the Fourth Amendment.[9]

---

[9] Neville also claims that the search of the Lincoln was "equally unconstitutional," explaining that because the discovery of the drugs occurred during an illegal search, there was no probable cause for a warrantless

Neville also asserts that the search was invalid under the Indiana Constitution. As stated, the legality of a search under the Indiana Constitution "turns on an evaluation of the police conduct under the totality of the circumstances." *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). Neville argues that Detective Ball used the traffic stop as a pretext to further an investigation of Milton, handcuffed Neville, searched him, and "only later advised Neville that he was being arrested[.]" *Appellant's Br*. at 34. Neville also argues that the search of Neville's person and genital area was "intrusive" and substantial, and that the minor driving offenses were not significant and did not justify Detective Ball's actions, arguing, "The record contains no evidence as to why such extreme measures were needed simply to ask Milton questions." *Id*. at 35. Therefore, he claims, the circumstances of the search were unreasonable under the Indiana Constitution. We disagree.

After learning that Neville did not possess a driver's license, nor did any of the adult occupants, Detective Ball asked Neville to step out of the car. Detective Ball handcuffed Neville, checked Neville's pockets, and detected large lumps in Neville's front crotch area, which he recognized as not being part of Neville's body and which he suspected to be "dope." He told Neville that he was going to remove the suspected drugs, and Neville said he would remove it himself, a proposition that Detective Ball declined. Neville asserted to Detective Ball that

---

search of the vehicle. *Appellant's Br*. at 31. Because we find that the drugs were discovered in a valid search incident to arrest, the officers had probable cause to search the vehicle.

he did not have authority to search Neville and go into his pants, to which Detective Ball stated, "I'm arresting you for driving." *State's Ex*. 2 at 18:36. Under Indiana law, probable cause for a lawful arrest supports a "full search" of the arrested person for weapons or concealed evidence. *Garcia v. State*, 47 N.E.3d 1196, 1200 (Ind. 2016). An intrusive search to secure and identify an unknown physical object discovered on an arrestee is not unreasonable, "provided that it is not extreme or patently abusive." *Edwards v. State*, 759 N.E.2d 626, 629 (Ind. 2001). We reject Neville's claims that Detective Ball did not give any indication of arrest until after he had retrieved the drugs and that the record does not indicate any need to search him. *Appellant's Br*. at 35. We also find that the search was not unduly intrusive, where the evidence most favorable to the verdict is that Detective Ball while wearing a glove reached into the front of Neville's pants and retrieved a baggie from inside Neville's underwear and in his groin area, and Neville's genitals were not exposed. We find that under the totality of circumstances the search of Neville was not unreasonable and did not violate the protections of the Indiana Constitution.

[32] Accordingly, for the reasons set forth above, the trial court did not abuse its discretion when it admitted the evidence obtained during the search of Neville and the car he was driving.

## II. Sufficiency of the Evidence

[33] Neville asserts that the evidence was not sufficient to convict him of dealing in a narcotic drug. Our standard of review with regard to sufficiency claims is well

settled. In reviewing a sufficiency of the evidence claim, this court does not reweigh the evidence or judge the credibility of the witnesses. *Wilson*, 966 N.E.2d at 1265. We consider only the evidence most favorable to the verdict and the reasonable inferences drawn therefrom and affirm if the evidence and those inferences constitute substantial evidence of probative value to support the verdict. *Id.* A conviction may be based upon circumstantial evidence alone. *Id.* The evidence need not be sufficient to overcome every reasonable hypothesis of innocence. *Craig v. State*, 730 N.E.2d 1262, 1266 (Ind. 2000). We affirm a conviction if the probative evidence and reasonable inferences drawn from that evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Drane v. State*, 867 N.E.2d 144, 147 n.4 (Ind. 2007).

[34] To convict Neville of Level 3 felony dealing in a narcotic drug as charged, the State was required to prove that he knowingly possessed between one and five grams of heroin with the intent to deliver the heroin while in possession of a firearm. Ind. Code §§ 35-48-4-1(a)(2), 35-48-1-16.5. Neville's argument, in addition to the claim that the heroin and firearm were illegally seized and wrongfully admitted at trial, is that there was insufficient evidence that he intended to deliver the drug. *Id*. at 40-41. A conviction for possession of a drug with intent to deliver it may be supported by either direct or circumstantial evidence. *Wilson*, 966 N.E.2d at 1266. Intent involves a person's state of mind, and a factfinder may infer its existence from the surrounding circumstances. *Id.*

[35] Under Indiana law, "possessing a large amount of a narcotic substance is circumstantial evidence of intent to deliver," which supports the inference that the person intended to deliver it and not consume it personally. *Davis v. State*, 791 N.E.2d 266, 270 (Ind. Ct. App. 2003), *trans. denied*. Detective Gregory Kessie ("Detective Kessie") a narcotics investigator with Indianapolis Metropolitan Police Department, who has been involved in thousands of narcotics investigations, testified to the differences between what users are often found with as opposed to dealers. He stated that users often just carry small amounts of money, enough to purchase a small amount of heroin, such as .10 grams for $10 or .20 grams for $20, and the narcotics found on the user are thus packaged in small amounts, whereas the dealer generally has narcotics packaged in bulk fashion, and they carry larger amounts of cash. *Tr. Vol. II* at 348-49. He testified that, in his experience, he had not encountered a person who possessed four grams of heroin strictly for personal use. *Id*. at 361. He also explained that the slang term "cut" means a powdered substance which can be mixed with the pure narcotics in order to "stretch the product" and make more money and that a person who was strictly a user would want a pure product and have no reason to want to dilute it. *Id*. at 350-51. Detective Kessie indicated that a cutting agent could be any powdered substance that could be made to appear similar in consistency to the illegal substance and could include baby formula, muscle powder, or antihistamine. He testified that users, as opposed to dealers, often are found to carry paraphernalia used to ingest the drugs. *Tr. Vol. II* at 347. Detective Kessie also stated that it was common for a

narcotics dealer to carry a firearm, to protect their product or themselves. *Id*. at 349.

[36] Neville urges that police found "no tools of the drug trade" such as scales, plastic baggies, ledgers, or multiple cell phones, either on him or in the Lincoln. *Appellant's Br*. at 41. However, the substances that Detective Ball found on Neville were over four grams of heroin and twenty-four grams of Doxylamine, a legal antihistamine. The police also found a handgun in the armrest of the driver's side door, where Neville was seated, and he had over $1200 in his wallet. The handgun was found to have his DNA on it. As the State points out, no paraphernalia that would be used to ingest the heroin was found on Neville or in the Lincoln, the absence of which could have been used to infer dealing rather than using the drugs. *See O'Neal v. State*, 716 N.E.2d 82, 90 (Ind. Ct. App. 1999) (evidence sufficient to infer intent to deal narcotics where defendant, who was searched after being arrested in course of traffic stop, was found in possession of relatively large quantity of drugs, handgun, and $1,128 in cash, but not in possession of items associated with dealing such as pager, scales, or transaction notes), *trans. denied*. Based on the record before us, we find that the evidence presented at trial was sufficient from which the jury could have inferred that Neville intended to deliver the heroin.

## III. Serious Violent Felon Conviction

[37] The State asserts as a cross-appeal the claim that the trial court erred when it vacated Neville's conviction for unlawful possession of a firearm by a serious

violent felon ("UPFSVF") and that the conviction should be reinstated. Neville maintains that the trial court properly vacated his UPFSVF conviction because, otherwise, he would be punished multiple times for the same act, which is prohibited under Indiana law.[10]

[38] "The double jeopardy clause . . . of the Indiana Constitution 'was intended to prevent the state from being able to proceed against a person twice for the same criminal transgression.'" *Duncan v. State*, 23 N.E.3d 805, 814 (Ind. Ct. App. 2014) (quoting *Richardson v. State,* 717 N.E.2d 32, 49 (Ind. 1999)), *trans. denied*. Conviction of two or more offenses violates the double jeopardy clause of the Indiana Constitution "if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Calvert v. State*, 930 N.E.2d 633, 641 (Ind. Ct. App. 2010) (quoting *Richardson,* 717 N.E.2d at 49) (emphasis in original). Under the actual evidence test, the defendant must show that the evidentiary facts establishing the elements of one offense also establish all of the elements of the second offense. *Vandergriff v. State*, 812 N.E.2d 1084, 1086 (Ind. Ct. App. 2004) (citing *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002)), *trans. denied*. "[E]ven if 'each

---

[10] Neville asserts, as a preliminary matter, that the State was not permitted to pursue the cross-appeal claim because vacating a conviction is not expressly identified in Indiana Code section 35-38-4-2 as a matter that the State may appeal, and he asks us to not consider the cross-appeal. The State responds that, under Indiana law, it may challenge by way of cross-appeal an erroneous sentencing decision – here, an alleged "erroneous refusal to impose a conviction and sentence on a lawful jury verdict[.]" *State's Reply Br*. at 5. We agree with the State that it may pursue their cross-appeal of the trial court's sentencing decision, and we address the cross-appeal on its merits.

charge utilizes the same factual event,' no constitutional violation will be found if the second offense 'requires additional evidentiary facts establishing the essential elements.'" *Vandergriff*, 812 N.E.2d at 1086-87.

[39] Here, the State charged Neville in Count I with Level 3 dealing in a narcotic drug and in Count II with Level 4 unlawful possession of a firearm as a serious violent felon. To convict Neville of dealing in a narcotic drug as charged, the State was required to prove that Neville (1) knowingly possessed between one and five grams of heroin, (2) with the intent to deliver, (3) while in possession of a firearm. Ind. Code §§ 35-48-4-1(a)(2), 35-48-1-16.5. With respect to the charge of unlawful possession of a firearm by a serious violent felon, the State was required to prove that Neville was (1) a serious violent felon, (2) who knowingly or intentionally, (3) possessed a firearm. *See* Ind. Code § 35-47-4-5(c).

[40] The State argues, and Neville does not appear to disagree, that his convictions on Counts I and II do not violate either the actual evidence test or the statutory elements test, and, therefore, there was no constitutional double jeopardy violation under *Richardson*. However, Neville correctly observes that "[e]ven where no constitutional violation has occurred, multiple convictions may nevertheless violate the 'rules of statutory construction and common law that are often described as double jeopardy, but are not governed by the constitutional test set forth in *Richardson*.'" *Appellant's Reply Br.* at 16-17; *Vandergriff*, 812 N.E.2d at 1088 (quoting *Pierce v. State*, 761 N.E.2d 826, 830 (Ind. 2002)). That is, our courts have recognized that, in addition to

constitutional double jeopardy, other categories of double jeopardy based on statutory construction and common law prohibit multiple convictions or punishments for the same crime. *Calvert*, 930 N.E.2d at 642 (citing *Guyton v. State,* 771 N.E.2d 1141, 1143 (Ind. 2002)).

[41] As explained by our colleague in *Vandergriff*, "these rules fall under broader categories set forth by Justice Sullivan in his concurring opinion in *Richardson*" and include the following:

> (1) "Conviction and punishment for a crime which is a lesser-included offense of another crime for which the defendant has been convicted and punished;" (2) "Conviction and punishment for a crime which consists of the very same act as another crime for which the defendant has been convicted and punished;" (3) "Conviction and punishment for a crime which consists of the very same act as an element of another crime for which the defendant has been convicted and punished;" (4) "Conviction and punishment for an enhancement of a crime where the enhancement is imposed for the very same behavior or harm as another crime for which the defendant has been convicted and punished;" and (5) "Conviction and punishment for the crime of conspiracy where the overt act that constitutes an element of the conspiracy charge is the very same act as another crime for which the defendant has been convicted and punished."

812 N.E.2d at 1088 (citing *Richardson,* 717 N.E.2d at 55-56 (Sullivan, J., concurring)).

[42] Here, Neville maintains that the trial court did not err when it vacated his UPFSVF conviction because his UPFSVF conviction and his dealing while in possession of a firearm conviction were based upon the same act or the "very

same behavior" – namely the presence of the handgun in the car he was driving. This court faced a similar situation in *Calvert v. State*, where Calvert was convicted for possessing a firearm as a serious violent felon and possessing a sawed-off shotgun. 930 N.E.2d at 642. The *Calvert* court found that the two convictions "were established by proof of one and the same act: his constructive possession of the sawed-off shotgun in the vehicle he was driving," and that even if the convictions did not amount to *constitutional* double jeopardy, "Calvert's convictions fall under the common law category of double jeopardy" that proscribes "[c]onviction and punishment for a crime which consists of the very same act as an element of another crime for which the defendant has been convicted and punished." 930 N.E.2d at 642 (emphasis in original). Because "Calvert's conviction of possessing a sawed-off shotgun was based on the very same act—his having the sawed-off shotgun in his vehicle— which formed an essential element of possession of a firearm by a serious violent felon[,]" this court reversed and remanded with instruction to vacate that conviction and sentence.[11]  *Id.* at 642-43.

_____

[11] In reaching its decision, the *Calvert* court discussed *Alexander v. State,* 772 N.E.2d 476, 479 (Ind. Ct. App. 2002), *trans. denied*, where the court determined that convictions for unlawful possession of a firearm by a serious violent felon and carrying a handgun without a license violated the actual evidence test of the Indiana double jeopardy analysis and constituted double jeopardy. *See also Jarrell v. State*, 818 N.E.2d 88, 93 (Ind. Ct. App. 2004) (convictions for possession of firearm by serious violent felon and carrying a handgun without a license violated double jeopardy principles, where evidence of constructive possession of handgun found under seat during traffic stop was used to prove essential element of possession of firearm by serious violent felon and all essential elements of carrying a handgun without a license.)

[43]    In support of its position that the UPFSVF should be reinstated, the State cites to *Guyton v. State*, among other cases. In *Guyton,* the defendant was convicted of both murder and carrying a handgun without a license. 771 N.E.2d at 1143. Our Supreme Court found no double jeopardy violation because "'[c]arrying the gun along the street was one crime and using it was another.'" *Id*. (quoting *Mickens v. State,* 742 N.E.2d 927, 931 (Ind. 2001)). We find that *Guyton* is distinguishable, because, here, as in *Calvert*, Neville's constructive possession of the handgun in the Lincoln was used to convict him for multiple offenses.

[44]    In this case, Neville's charge for dealing in a narcotic drug was elevated from a Level 4 to a Level 3 based on the allegation that Neville possessed a firearm. In *Duncan*, a defendant's resisting law enforcement conviction was elevated from Class A misdemeanor to Class D felony based on an allegation that he "drew or used a deadly weapon" while fleeing. 23 N.E.3d at 817. On appeal, Duncan asserted that his convictions of attempted battery by means of a deadly weapon, resisting law enforcement, and pointing a firearm violated double jeopardy principles under the actual evidence test. The *Duncan* court recognized that "[e]ven if we assume there is no double jeopardy violation under the actual-evidence test, . . . 'we have long adhered to a series of rules of statutory construction and common law that are often described as double jeopardy, but are not governed by the constitutional test set forth in *Richardson*,'" one of which prohibits "[c]onviction and punishment for an enhancement of a crime where the enhancement is imposed for the very same behavior or harm as another crime for which the defendant has been convicted and punished." 23

N.E.3d at 817 (quoting *Richardson,* 717 N.E.2d at 56 (Sullivan, J., concurring)). It continued, "Thus, if we determine that Duncan was convicted and punished for the enhancement of resisting law enforcement based on the same behavior or harm that forms the basis of his attempted battery by means of a deadly weapon conviction, a double jeopardy violation has occurred." *Id.* The *Duncan* court determined that a double jeopardy violation had occurred in that case because the defendant was convicted and punished for the enhancement of resisting law enforcement based on "the very same act" – *i.e.*, he fired a gun at the officer – that formed the basis of his attempted battery by means of deadly weapon conviction. *Id.* at 818. The *Duncan* court vacated the defendant's resisting law enforcement conviction based on drawing or using a deadly weapon and reduced that conviction to a Class A misdemeanor. *Id.* at 819.

[45] We conclude that Neville was convicted and punished for the enhancement of dealing in a narcotic drug based on the same behavior or harm that forms the basis of his UPFSVF conviction, having a handgun in the car. We find that the trial court did not err when it vacated Neville's UPFSVF conviction.[12]

[46] Affirmed.

Mathias, J., and Altice, J., concur.

---

[12] Neville alternatively asserts that it was not error for the trial court to vacate his UPFSVF conviction because the State failed to prove that he is the same person identified in the documents as having been convicted of robbery and thus failed to present sufficient evidence that he was a serious violent felon. Because we resolve the issue on other grounds, we do not reach Neville's sufficiency argument.