ATTORNEYS FOR APPELLANT
Steve Carter
Attorney General of Indiana

Zachary J. Stock
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
Gregory A. Brand
Greenfield, Indiana

_____

# In the
# Indiana Supreme Court

_____

No. 30S01-0410-CR-458

STATE OF INDIANA,

*Appellant (Plaintiff below),*

v.

THOMAS A. QUIRK,

*Appellee (Defendant below).*

_____

Appeal from the Hancock Circuit Court, No. 30C01-0103-CF-34
The Honorable Michael Peyton, Special Judge

_____

On Petition To Transfer from the Indiana Court of Appeals, No. 30A01-0305-CR-188

_____

**February 14, 2006**


**Rucker, Justice.**

**Case Summary**

Defendant Thomas A. Quirk was charged with dealing in cocaine as a Class A felony in violation of Ind. Code § 35-48-4-1 and possession of cocaine as a Class C felony in violation of Ind. Code § 35-48-4-6. After a hearing the trial court granted Quirk's motion to suppress evidence seized by law enforcement officers during a search of his truck following a routine traffic stop. On appeal the Court of Appeals reversed. Concluding that the law enforcement officers' search was not reasonable within the meaning of Article 1, Section 11 of the Indiana Constitution, we now affirm the trial court's judgment.

**Facts and Procedural History**

The facts in this case are undisputed. In the early morning hours of March 17, 2001, Thomas A. Quirk was traveling eastbound on Interstate Highway 70 through Hancock County, driving a semi tractor-trailer. Indiana State Trooper Timothy Denny observed that one of the headlights on Quirk's truck was out. While pursuing another vehicle for speeding, Trooper Denny radioed a fellow Trooper in the area and gave him the headlight information. Responding to the call, State Trooper Mitchell Blocher activated his emergency lights and pulled Quirk over at the entrance ramp to a rest area. After explaining why he had initiated the traffic stop, Trooper Blocher obtained Quirk's driver's license, registration, logbook and bill of lading. The Trooper found nothing unusual about the registration and logbook, and the bill of lading reported that Quirk was traveling from Arizona to West Virginia with a cargo of lettuce. Directing Quirk to accompany him to the patrol car, Trooper Blocher sat in the driver's seat and Quirk sat in the front passenger seat. Trooper Blocher then began writing a warning ticket for the unilluminated headlight. As a part of the ticket writing process, Trooper Blocher conducted a check on his laptop computer of Quirk's driving record. The check revealed no outstanding warrants and a valid driver's license issued by the State of California. However, the information on the Trooper's computer screen indicated that Quirk was known under three different aliases. When questioned, Quirk replied that he had "used aliases a long time ago because he had problems with his [driver's] license." Tr. at 39. Using his police radio Trooper Blocher contacted the State Police Post and requested that a "Triple I" (criminal history) check of Quirk be conducted.

Hearing the Triple I request over his own radio, Trooper Denny came to the scene, exited his patrol car, got into the back seat of Trooper Blocher's car and sat directly behind Quirk. At that point the response to the criminal history check came on Trooper Blocher's cellular telephone. Still completing paperwork for the warning ticket, Trooper Blocher handed the phone to Trooper Denny. The dispatcher advised Trooper Denny that Quirk's criminal history consisted of "four to six entries for possibly trafficking in narcotics." Tr. at 117-18. All entries were dated between 1970 and 1988. Tr. at 118. Trooper Denny then asked Quirk if he had ever been arrested, to which Quirk responded that he had once been an enforcer for a union and during that period he was arrested for battery. Tr. at 118-19. Trooper Blocher then gave Quirk a warning ticket for the headlight and advised Quirk that he was free to leave.

As Quirk walked toward his truck Trooper Denny told Trooper Blocher about Quirk's criminal history. Trooper Blocher then called to Quirk and said that he wanted to ask a few more questions. Quirk complied and the three men got back into Trooper Blocher's patrol car. The questions centered on whether Quirk was carrying any illegal substances, to which Quirk responded that he was not. Trooper Blocher then asked to search the trailer portion of the truck, and Quirk consented. Conducting the search, Trooper Denny confirmed that the trailer contained a cargo of lettuce. Although the record is not altogether clear, apparently Trooper Denny then asked Quirk for consent to search the cabin portion of the tractor. Quirk declined and the Troopers once again allowed him to leave. Quirk then entered his truck, drove into the rest area, exited the truck, and went inside the building to use the facilities.

In the meantime, both Troopers followed Quirk into the rest area, and Trooper Blocher radioed for a drug-sniffing dog. As Quirk exited the building, the Troopers approached Quirk and informed him that although he was free to leave, the truck would have to remain. Approximately twenty minutes later other officers began arriving on the scene including a canine unit. Circling the truck, a drug-sniffing dog alerted to the presence of a controlled substance in the cabin area of the tractor. A subsequent search revealed a white powdery substance later identified as cocaine.

Quirk was arrested and ultimately charged with dealing in cocaine as a Class A felony and possession of cocaine as a Class C felony. Prior to trial Quirk timely moved to suppress the cocaine. Following an evidentiary hearing, the trial court granted Quirk's motion. In a detailed nine-page order setting forth the evidence presented in the case, the trial court concluded that the reasons put forth by the law enforcement officers either separately or collectively did not amount to a reasonable suspicion of criminal activity. Upon the State's request the trial court certified its order for interlocutory appeal, and the Court of Appeals accepted jurisdiction. The State argued the trial court erred in granting Quirk's motion because Trooper Blocher, who stopped the defendant's truck for a routine traffic infraction, developed reasonable suspicion to detain Quirk in order to permit a dog sniff of his truck. Quirk countered that the trial court was correct in granting his motion to suppress, arguing that the cocaine was properly excluded because the search that uncovered it was the result of an unreasonable detention. In an unpublished memorandum decision the Court of Appeals reversed the trial court's judgment. See State v. Quirk, No. 30A01-0305-CR-188 (Ind. Ct. App. Jun. 30, 2004). Having previously granted transfer, we now affirm the judgment of the trial court.

**Discussion**

**I.**

Quirk contends the search of his truck offends the Fourth Amendment to the United States Constitution as well as Article I, Section 11 of the Indiana Constitution. Quirk presents separate authority supporting both claims. We decline to address Quirk's federal constitutional argument and respond to his State claim only.

Article I, Section 11 provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated . . . ." The purpose of this article is to protect from unreasonable police activity those areas of life that Hoosiers regard as private. Moran v. State, 644 N.E.2d 536, 540 (Ind. 1994). The provision must receive a liberal construction in its application to guarantee the people against unreasonable search and seizure. Brown v. State, 653 N.E.2d 77, 79 (Ind. 1995). In resolving challenges asserting a Section 11 violation, courts must consider the circumstances presented in each case to

determine "whether the police behavior was reasonable." Id. We place the burden on the State to show that under the totality of the circumstances its intrusion was reasonable. Bulington v. State, 802 N.E.2d 435, 438 (Ind. 2004). Thus, we are called upon to determine whether the law enforcement officers' detention of Quirk in order to conduct a dog sniff of his truck was reasonable under the totality of the circumstances.

## II.

Our standard of appellate review of a trial court's ruling on a motion to suppress is similar to other sufficiency issues. Taylor v. State, 689 N.E.2d 699, 702 (Ind. 1997). The record must disclose substantial evidence of probative value that supports the trial court's decision. Id. We do not reweigh the evidence, and we consider conflicting evidence most favorably to the trial court's ruling. Id.

Quirk does not contend that the initial stop of his truck was in violation of the Constitution, nor could he do so. "[P]olice officers may stop a vehicle when they observe minor traffic violations." Black v. State, 621 N.E.2d 368, 370 (Ind. Ct. App. 1993). A traffic violation, however minor, creates probable cause to stop the driver of the vehicle. Here, Trooper Blocher's observation that Quirk was operating his tractor-trailer with an unilluminated headlight justified the initial stop in the case. This intrusion cannot be considered unreasonable.

Quirk's essential claim is that his detention after he was first advised that he was free to leave violated his Article 1, Section 11 right against unreasonable searches and seizures. A police stop and brief detention of a motorist is reasonable and permitted under Section 11 if the officer reasonably suspects that the motorist is engaged in, or about to engage in, illegal activity. Mitchell v. State, 745 N.E.2d 775, 786 (Ind. 2001). Section 11 permits an officer, during an investigatory stop, to detain a motorist briefly only as necessary to complete the officer's work related to the illegality for which the motorist was stopped. Id. at 788. Where an officer stops a vehicle for a traffic violation, a request for the driver's license and vehicle registration, a license plate check, a request to search the driver's vehicle and an inquiry regarding whether the driver has a weapon in the vehicle are within the scope of reasonable detention. See, e.g., Halsema v.

5

State, 823 N.E.2d 668, 670-71 (Ind. 2005) (license plate check performed after traffic stop); Lockett v. State, 747 N.E.2d 539, 543 (Ind. 2001) (an officer may as a matter of routine practice ask a driver stopped for a traffic violation if he has a weapon in the vehicle or on his person); Jones v. State, 655 N.E.2d 49, 52-53 (Ind. 1995) (after a traffic stop, officer requested driver's license and registration, asked the driver if the car and its contents belonged to him, and whether the officers could search the driver's car).

In this case, Trooper Blocher testified that his decision to detain Quirk beyond the time necessary to issue a warning ticket for Quirk's unilluminated headlight was based upon the following facts:  (1) Quirk demonstrated nervous behavior by failing to make eye contact and shifting in his seat, (2) Quirk's bill of lading was handwritten, (3) Quirk had used aliases in the past, (4) Quirk had a criminal history which included the transportation of a controlled substance, (5) Quirk lied about his criminal history, and (6) Quirk's driver's license was issued from and he was traveling from states the officer believed to be sources of narcotics.  Tr. at 53-55, 57, 59, 64-66.

It is true that nervousness may indicate potential wrongdoing.  However, we have been hesitant to assign significant weight to a person's display of nervousness.  In Finger v. State, acknowledging that "[s]ome courts have found nervousness on the part of the occupants is a factor leading an officer to form reasonable suspicion of criminal activity," a majority of this Court determined "we place little weight on that fact alone."  799 N.E.2d 528, 534-35 (Ind. 2003) (making this particular point on Fourth Amendment grounds but declaring, "the factors leading to reasonable suspicion . . . also satisfy the requirements of the Indiana Constitution . . . .").  See also Rutledge v. State, 426 N.E.2d 638, 641 (Ind. 1981) ("The show of authority is unsettling and creates substantial anxiety.").  Because it is not at all unusual that a citizen may become nervous when confronted by law enforcement officials, other evidence that a person may be engaged in criminal activity must accompany nervousness before the nervousness will evoke suspicion necessary to support detention.

At the suppression hearing, the State placed emphasis on Quirk's bill of lading. According to the State it was handwritten and therefore suspicious.[1] However the trial court rejected the State's argument. Instead the trial court noted that the bill of lading was on a regular pre-printed commercial form, the date shown for the pick up of the cargo was consistent with the travel time from Arizona to Indiana, and the contents of the cargo shown on the bill of lading were consistent with Trooper Denny's examination of the trailer. And acknowledging that a portion of the document was handwritten, the trial court declared, "[t]he hand written portions of the form do not appear to be so illegible or misleading as to constitute an articulable basis to warrant a reasonable belief that any portion of the vehicle contained contraband." Appellant's App. at 79. The evidence of record supports the trial court's determination on this point. We do not reweigh this evidence and we consider any conflicting evidence most favorably to the trial court's ruling. Taylor, 689 N.E.2d at 702.

With respect to Quirk's prior use of aliases, nothing in the record suggests when or where the aliases were used. Quirk offered an explanation that he had experienced trouble in the past in obtaining a driver's license and had used other names in an attempt to secure one. Tr. at 39. Even with this information Trooper Blocher allowed Quirk to leave, not once, but twice: first, after he wrote the warning ticket and returned all of Quirk's paperwork, and again after Quirk refused to consent to the search of the cabin of the tractor. The testimony of Trooper Blocher offered no reason why the use of aliases would necessarily lead him to a conclusion that criminal activity was being conducted at the time of the stop. In like fashion, neither can this Court discern any such reason. We give no weight to this factor.

Trooper Blocher's Triple I request resulted in information revealing Quirk's criminal history that consisted of "four to six entries for possibly trafficking in narcotics." Tr. at 117-18. According to the State, this fact further supported the Troopers' decision to detain Quirk. It is true that under some circumstances knowledge of a suspect's criminal history may justify an investigatory stop. See, e.g., Mitchell, 745 N.E.2d at 788 (protracted detention after routine traffic stop based in part on officer's knowledge of current and past narcotics investigation

---

[1] We observe the State makes no claim on appeal concerning the bill of lading. However, we address this claim because it served as part of the underlying basis for the officers' decision to detain Quirk.

involving defendant).[2]  Here, however, nothing in this record reveals whether these were arrests or convictions or the nature of their disposition.  And the most recent entry occurred in 1988, thirteen years before the date of the stop.  These circumstances do not support the claim that the Troopers could reasonably suspect that Quirk "is engaged in, or [was] about to engage in, illegal activity."  Id. at 787.

The State also points out that Quirk did not reply truthfully when questioned about his criminal history, opting instead to maintain that he had previously been arrested only for battery. We find the following observation instructive:

> [A]n inconsistent answer regarding past conduct is less suspicious than an inconsistent answer regarding present destination or purpose.  An inconsistent answer as to the former might cast a shadow of dishonesty upon the character of the motorist, but an inconsistent answer regarding the latter casts suspicion and doubt on the nature and legitimacy of the activity being investigated.

United States v. Jones, 269 F.3d 919, 928 (8th Cir. 2001).  Although Quirk was less than forthright when he indicated he had been previously arrested only for battery, we do not think it is particularly unusual that a person would fail to provide law enforcement with information about his past that would attract unwanted attention.  We assign no weight to this factor.

Apparently Quirk was a resident of California and his driver's license was issued by that state.  Trooper Blocher testified that his suspicions were aroused because not only California, but also Arizona—the state in which Quirk picked up his cargo of lettuce—was a "source state" for drugs.  Tr. at 93-94.  Trooper Blocher's criteria for imparting that designation were unexplained. The Trooper testified that he had been "trained as to the source states for narcotics," that the training was "drug interdiction training," and that the training was conducted at the State Police Post in Indianapolis.  Tr. at 85.  But he gave no further information on what the training entailed.

---

[2] But see Carter v. State, 692 N.E.2d 464, 467 (Ind. Ct. App. 1997) (reversing the trial court's denial of defendant's motion to suppress a seized handgun, where the officer's suspicion was based in part on his knowledge of the defendant's prior criminal record).  "[E]ven if an officer had previously arrested an individual and the arrests had led to convictions, 'it would not have amounted to the reasonable suspicion necessary to stop the individual.'"  Id. (quoting Tumblin v. State, 664 N.E.2d 783, 784 n.3 (Ind. Ct. App. 1996)).

Indeed, Trooper Blocher testified that he also considered any state bordering Mexico to be a source state for drugs. Tr. at 56.

Law enforcement officials have not only classified a number of states as sources of drugs, but also a significant number of the largest cities in the United States as "drug source cities." See United States v. Beck, 140 F.3d 1129, 1138 n.3 (8th Cir. 1998) (citing cases that demonstrate seven states, including "the entire West Coast," along with eighteen different cities have been identified as sources of drugs). However, we observe that out-of-state license plates alone are wholly consistent with innocent behavior. See United States v. Yousif, 308 F.3d 820, 828-29 (8th Cir. 2002) (The fact that a "vehicle had out-of-state license plates and was traveling on a highway that was known to the officers as a drug trafficking corridor cannot alone justify the stop because [t]oo many people fit this description for it to justify a reasonable suspicion of criminal activity.") (citation and quotation marks omitted). Millions of law-abiding citizens reside in California and Arizona and travel throughout the country. More importantly, considering the substantial number of states and cities that have been designated as sources of drugs, a motorist, in our highly mobile society, would be hard pressed not to travel either from, to, or through a drug-source jurisdiction. We conclude the "source state" designation is a non-factor to support reasonable suspicion of criminal activity.

We acknowledge that conduct, which would be wholly innocent to the untrained observer, might acquire significance when viewed by an officer who is familiar with the practices of drug smugglers and the methods used to avoid detection. See, e.g., Halsema, 823 N.E.2d at 673 n.1 (officer received special training concerning production, manufacture, and distribution of methamphetamine); Gee v. State, 810 N.E.2d 338, 342 (Ind. 2004) (officer identified substance based upon training and experience as a police officer); Love v. State, 741 N.E.2d 789, 792 (Ind. Ct. App. 2001) (officer testified that a certain quantity of cocaine and cash was consistent with amount possessed by mid-level type dealer). Still, a combination of irrelevant conduct and innocent conduct, without more, cannot be transformed into a suspicious conglomeration.

9

## Conclusion

We conclude that under the totality of the circumstances the Troopers' detention of Quirk beyond the period necessary to issue a warning ticket and the subsequent search of his truck was unreasonable within the meaning of Article I, Section 11. As a result, the evidence seized thereby was tainted and was properly suppressed. We therefore affirm the judgment of the trial court.

Shepard, C.J., and Dickson, Sullivan and Boehm, JJ., concur.