

**FILED**

Nov 07 2024, 8:41 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

State of Indiana,

*Appellant-Defendant*

v.

James W. Baker, Jr.,

*Appellee-Plaintiff*

---

November 7, 2024

Court of Appeals Case No.
24A-CR-914

Appeal from the Hamilton Superior Court

The Honorable William J. Hughes, Judge

Trial Court Cause No.
29D03-2306-F4-4211

---

**Opinion by Judge Brown**
Judge Kenworthy concurs.
Judge Mathias dissents with opinion.

**Brown, Judge.**

[1] The State appeals the trial court's order granting a motion to suppress filed by James W. Baker, Jr. The State maintains that the trial court erred in granting Baker's motion to suppress. We reverse and remand.

**Facts and Procedural History**

[2] During the early morning hours of June 12, 2023, Carmel Police Officer Thomas Szybowski patrolled the parking lot of the Extended Stay America, a lot he patrols often due to past criminal interactions and arrests. He observed a man later identified to be Baker "around a brown pick-up truck." Transcript Volume II at 8. Baker's behavior changed and he "appeared to hide behind a pillar of the vehicle to conceal his face." *Id.* Officer Szybowski considered Baker's conduct as "being evasive." *Id.* at 19. Officer Szybowski obtained the license plate information, circled the lot, and returned to complete a "second pass" when Baker was "proceeding into the hotel room." *Id.* at 8.

[3] Officer Szybowski ran the license plate information and discovered the truck was registered to James Baker. When he ran a query on the name James Baker with a date of birth, he discovered that individual had "a full extradition warrant . . . for Boone County." *Id.* at 9. Officer Szybowski requested additional officers, "did another loop," observed Baker, who was with a female later identified as Elizabeth, walking across the parking lot, and asked him to stop and talk with him. *Id.* at 10. Other officers arrived "maybe a minute, maybe two minutes" after Officer Szybowski requested them. *Id.* at 12. Officer

Szybowski pulled his vehicle up to the curb lane, parked without his emergency lights activated, and did not block any vehicles "from being able to come or go in that lane of travel and . . . did not block any of the parked vehicles" including the pickup truck.[1] *Id.* at 15.

[4]     Officer Szybowski asked Baker for his identification, and Baker provided an identification card. Officer Szybowski told Baker that the registration returned to a wanted male, and Baker said that he was "borrowing [the truck] from a friend, Jimmy." *Id.* at 14. Baker said that he "did not know anybody was wanted or [he] wouldn't have borrowed their truck." Joint Exhibit 1 at 2:10-2:15. Officer Szybowski asked Baker if he had anything else with his identification on it, and Baker said no. Officer Szybowski held up the identification card, looked at Baker, and said, "I'm not going to lie. This doesn't really doesn't look like you." *Id.* at 3:50-3:57. Baker said, "That's me, man." *Id.* at 3:58-4:00. Officer Szybowski told Baker that he needed him to "hang tight" for him, returned to his vehicle, and entered information in his computer which displayed photographs. *Id.* at 4:09-4:11. He reviewed the BMV information which included a photo of a person named James Baker. The identification card provided by Baker had a different name and a different image than the BMV photograph for the wanted individual. Officer Szybowski

---

[1] Officer Szybowski testified that "the design of that parking lot is like a doughnut or a big circle around the hotel building itself and so two cars can pass. So there's two lanes even though it's not identified with painting on the ground as two lanes, but it's not a one-way loop, if you will. Parking's on the outside of it except for the front of the building and the back of the building, but the sides it's just on the outside, not up against the building." Transcript Volume II at 15.

informed another officer that he believed the person with whom he spoke was the wanted subject and asked the officer to compare the photographs of the wanted subject and the photograph on the identification card with the person with whom he spoke. The officer informed Officer Szybowski that Baker looked more like the person in the wanted photographs than the photograph on the provided identification card.

[5] Given the warrant and what he believed was Baker falsely identifying himself, Officer Szybowski placed him in handcuffs. Officer Szybowski told Baker, "We're not taking you to jail necessarily, but I don't believe the ID you gave me is accurate." *Id.* at 9:09-9:14. Officer Szybowski patted down Baker and set his keychain down with his belongings because it had a knife. Officer Szybowski asked Baker for the last four digits of his social security number, and Baker said, "I don't even know my [social security number] right now. As a matter of fact, I don't even want to answer any more questions. You guys are ridiculous. This is . . . this is nuts. I'm exercising my Fifth Amendment right." *Id.* at 10:02-10:12. Officer Szybowski informed Baker he was going to have him sit in the back of his vehicle until his investigation was over. Baker asked Officer Szybowski what he was investigating, and he answered, "That vehicle and the registered owner whom you resemble as opposed to the ID you gave me." *Id.* at 10:22-10:27. He placed Baker in the back of his police vehicle "which was not blocking the vehicle but was within two cars' length of the vehicle and in physical observation of that vehicle." Transcript Volume II at 15.

[6] Officer Szybowski then spoke with Elizabeth who indicated that the man she was with was named Jimmy. Officer Szybowski returned to his vehicle and said, "Hey Jimmy, you're going to get a new charge unless you want to just be honest with me at this point." Joint Exhibit 1 at 12:02-12:08. Baker said, "For one, my name's not Jimmy. For two, I already told you I'm not answering any more questions." *Id.* at 12:08-12:12. Officer Szybowski conferred with another officer, showed her the identification card Baker provided, and she agreed that the photo on the identification card did not look like Baker but he did look like the person in the BMV photo. Officer Szybowski returned to his vehicle and entered some information into his computer.

[7] "[E]arly on in the investigation," Officer Szybowski requested a canine officer. Transcript Volume II at 24. Carmel Police Officer Branden Owens and his canine, Jax, a dog certified for narcotics through the National Narcotics Detective Dogs of America, arrived at the scene. Officer Szybowski asked Officer Owens, who was speaking to Elizabeth, to run Jax around the pickup truck associated with Baker and Elizabeth. Officer Owens said that he could try but they had just conducted a "whole building search."[2] Joint Exhibit 1 at

---

[2] On cross-examination, defense counsel asked Officer Owens: "So, you initially were a little hesitant and said, hey, we just did a whole building search. Is that because of the dog getting tired or unfocused or what? Why would you answer in that way?" Transcript Volume II at 41-42. Officer Owens answered: "Because after a building search, the dog is pretty tired, and he will then use his mouth to breathe and not his nose." *Id.* at 42. Defense counsel asked: "So, in your opinion, does that give any concern to the validity of the positive indication on the vehicle?" *Id.* Officer Owens answered: "I believe it would be the opposite." *Id.* On redirect examination, Officer Owens explained that Jax is typically exhausted after a long building search and that he "is less likely to false on a car after a building search than he is [at] any other time." *Id.* at 43.

13:46-13:48. Officer Owens deployed Jax to conduct an exterior sniff of the pickup truck.

[8] Officer Szybowski made a phone call and stated, "Hey. Are you coming over here? Alright. Are you cool if I ask for . . . This guy's still refusing to cooperate. I have a driver's license. He doesn't look like him. The car they're associated with, the guy has a full extradition warrant out of Indiana. Is it cool if I ask for a north district car to come over here with a fingerprint scanner?" *Id.* at 14:26-14:52. He then requested a car with a fingerprint scanner.

[9] Officer Owens informed Officer Szybowski that Jax alerted to the presence of narcotics on the truck. Officer Szybowski walked over to where Elizabeth was standing, and another officer informed him that Elizabeth had provided consent to search her bags. After looking in a bag, Officer Szybowski stated, "That's a crack pipe." *Id.* at 16:45-16:47. Due to Elizabeth indicating that she had a broken wrist, Officer Szybowski placed one of her arms in a handcuff and attached the other handcuff to the belt loop on her pants. Officer Szybowski spoke with Elizabeth and stated, "I'm going to be completely transparent, honest, and cool with you guys. He already hates me, and that's fine. It's probably because he's wanted. Okay. But I'm going to verify that shortly when a Metro car comes with a fingerprint scanner." *Id.* at 18:54-19:06.

[10] After another officer arrived, Officer Szybowski showed the officer the identification card presented by Baker and a photograph of the wanted individual. Officer Szybowski stated, "And if you want to look at him, he looks

more like that." *Id.* at 23:44-23:49. The other officer looked at Baker, and said "Yeah, that's him." *Id.* at 24:18-24:20.

[11] Prior to touching the truck, Officer Owens used a flashlight to look inside of the truck and observed a pipe used for smoking methamphetamine. Officer Owens notified Officer Szybowski, and the two officers conducted a search of the vehicle and discovered methamphetamine, paraphernalia, cocaine or crack cocaine, and marijuana. At that point, Officer Szybowski determined that Baker "went from being detained to under arrest." Transcript Volume II at 17. Baker still did not provide "verbal confirmation . . . on his identification." *Id.* Officer Owens entered the Extended Stay to ask if there was anyone booked under the name James Baker, but "[t]hey were less than helpful in that."[3] *Id.* at 39. At some point, an Indianapolis Metropolitan Police Officer responded to the scene with a fingerprint scanner "which was refused due to his argumentativeness, and they wanted to avoid that necessary fight." *Id.* at 27. Officers transported Baker to the jail to verify his identity through fingerprinting or book him as a John Doe.

[12] The State charged Baker with: Count I, possession of methamphetamine as a level 4 felony; Count II, possession of cocaine as a level 6 felony; Count III,

---

[3] During direct examination, the prosecutor asked: "So, the hotel was not willing to provide you information about who was staying there? Is that correct?" Transcript Volume II at 40. Officer Owens answered: "Correct. They just told me they did not have anybody under that name, but I don't know if that's because there wasn't, or they didn't want to give me the information." *Id.*

identity deception as a level 6 felony; and Count IV, possession of paraphernalia as a class C misdemeanor.

[13] On January 3, 2024, Baker, by counsel, filed a Motion to Suppress Evidence alleging that the warrantless search of his vehicle violated the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. On March 1, 2024, the court held a hearing at which Officers Szybowski and Owens testified and the court admitted video from Officer Szybowski's body camera.

[14] On March 26, 2024, the trial court entered a sixteen-page order granting Baker's motion to suppress. The court found that, at the time of the dog sniff of the truck, both Baker and Elizabeth were in custody and the keys to the vehicle were in the possession of the police. The court found the facts similar to those in *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710 (2009), and that the search of the pickup truck could not be justified under the search incident to arrest exception to the warrant requirement of the Fourth Amendment. The court stated that "exigent circumstances may justify a warrantless entry and a warrantless seizure where Police have probable cause to believe that there is an imminent danger of destruction of evidence or risk of bodily injury to the police or others." Appellant's Appendix Volume II at 97. The court stated that "Jax alerted during his walk around sniff of the pickup truck and Officer Owens had viewed the meth pipe on the console of the pickup truck, **AFTER** Defendant was in custody, handcuffed and, in a police vehicle." *Id.* It found that the State's argument did not "address the second prong under federal analysis,

**EXIGENT CIRCUMSTANCES** not of police manufacture." *Id.* at 98. It found that there was "no justification given . . . for any belief that there was risk of imminent injury to police or to third parties nor [was] there any real possibility that the pickup Truck and any evidence that may be in it imminent [sic] peril of loss or destruction." *Id.* In addressing Indiana law, the court discussed *State v. Hobbs*, 933 N.E.2d 1281 (Ind. 2010), observing that the *Hobbs* Court held that the search in that case "was subject to the automobile exception such that, under federal analysis, no warrant was required to search the vehicle if the officers had probable cause to believe it contained evidence of a crime." *Id.* at 101. The court stated:

> [Baker] herein seeks to distinguish the *Hobbs* decision on the basis that here the vehicle was in a hotel parking lot of the Extended Sta[y] America parking lot, [Baker's] temporary residence, when the search occurred. Further, [Baker] was under arrest and incapable of accessing or moving the vehicle such that the police need to act and search the vehicle before a warrant could be obtained was not evident from the record presented by the State. The Court notes that the State does have the burden to establish that a warrantless search was reasonable under both Federal and Indiana analysis.

*Id.* at 102.[4] It found that Article 1, Section 11 of the Indiana Constitution required suppression of any evidence obtained without a warrant where Baker was in custody, probable cause to believe the vehicle with which Baker was

---

[4] While the trial court mentioned the automobile exception and Baker's argument, it did not specifically rule on whether the automobile exception applied.

associated may contain contraband was first received after the arrest, the suspected contraband was unrelated to the matter for which Baker was arrested, and there was no likelihood that the vehicle would be moved or evidence destroyed before a warrant could be obtained.

## Discussion

The State contends the trial court erred in granting Baker's motion to suppress.[5] "In reviewing a trial court's motion to suppress, we determine whether the record discloses 'substantial evidence of probative value that supports the trial court's decision.'" *State v. Renzulli*, 958 N.E.2d 1143, 1146 (Ind. 2011) (quoting *State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006)). "We do not reweigh the evidence, but consider 'conflicting evidence most favorably to the trial court's ruling.'" *Id.* (quoting *Quirk*, 842 N.E.2d at 340). "When the State appeals from a negative judgment, as here, it 'must show that the trial court's ruling on the suppression motion was contrary to law.'" *Id.* (quoting *State v. Washington*, 898 N.E.2d 1200, 1203 (Ind. 2008), *reh'g denied*). "[T]he ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo." *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014).

The State raises arguments under: (A) the Fourth Amendment; and (B) Article 1, Section 11 of the Indiana Constitution.

---

[5] Pursuant to Ind. Code § 35-38-4-2(a)(5), the State appeals from the suppression of evidence which effectively precludes further prosecution.

## A. *Fourth Amendment*

[17] The State argues the search of Baker's truck was permissible under the Fourth Amendment's automobile exception and no separate showing of exigency was required. Baker asserts that the truck was properly parked and argues that the automobile exception applies only to vehicles found in non-residential areas.[6]

[18] The Fourth Amendment to the United States Constitution provides in pertinent part: "The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. If a search is conducted without a warrant, the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies. *M.O. v. State*, 63 N.E.3d 329, 331 (Ind. 2016).

[19] We note that a search falls within the automobile exception when a vehicle is readily mobile and there is probable cause to believe it contains contraband or evidence of a crime.[7] *Meister v. State*, 933 N.E.2d 875, 878-879 (Ind. 2010)

---

[6] On appeal, Baker asserts that the State implies that the trial court granted his motion to suppress under both the United States Constitution and Indiana Constitution and that a reading of the trial court's order reveals that the court granted the motion based on a violation of Article 1, Section 11 of the Indiana Constitution and it did "not appear to reach a conclusion on the Federal Constitution analysis." Appellant's Brief at 4 n.1. The trial court's order discussed the "federal analysis" and concluded that "[u]nder Federal jurisprudence both probable cause, the reasonable belief that there is evidence in a place, and a reasonable belief that unless action is taken before a warrant can be obtained life will be imperiled or evidence will be destroyed or lost are required to justify a warrantless search based upon exigent circumstances." Appellant's Appendix Volume II at 98. Given the trial court's order, we will address the State's claims under both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.

[7] To the extent the trial court found the facts similar to those in *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710 (2009), we note that the Court in *Gant* discussed the search incident to arrest exception and not the

(citing *Maryland v. Dyson*, 527 U.S. 465, 467, 119 S. Ct. 2013 (1999)). The automobile exception is grounded in two notions: "1) a vehicle is readily moved and therefore the evidence may disappear while a warrant is being obtained, and 2) citizens have lower expectations of privacy in their vehicles than in their homes." *State v. Hobbs*, 933 N.E.2d 1281, 1285 (Ind. 2010) (citing *California v. Carney*, 471 U.S. 386, 391, 105 S. Ct. 2066 (1985)). The United States Supreme Court has specifically stated that, when there is probable cause that a vehicle contains evidence of a crime, a warrantless search of the vehicle does not violate the Fourth Amendment. *Meister,* 933 N.E.2d at 879 (citing *California v. Acevedo,* 500 U.S. 565, 569, 111 S. Ct. 1982 (1991)); *see also Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S. Ct. 2485, 2487 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more." (citing *Carney,* 471 U.S. at 393, 105 S. Ct. 2066)).

[20] "Most cases addressing the automobile exception arise in the context of an arrest or an investigatory stop of a motorist that gives rise to probable cause, but the exception is grounded in the mobility of the vehicle and its location in a public area, not on whether the issue arises in the context of an arrest or a traffic stop." *Hobbs*, 933 N.E.2d at 1285. "As the Supreme Court of the United States explained in *Carney,* the exception applies to vehicles that are readily mobile

___

automobile exception. Because we find that the automobile exception applies, we need not address the search incident to arrest exception.

and are found in a non-residential area." *Id.* (citing *Carney*, 471 U.S. at 392-393, 105 S. Ct. 2066). "The clear implication is that an operable vehicle found in a residential area may not be searched under this exception, but one located in a non-residential area, whether by reason of a police stop or not, is subject to the exception." *Id.* at 1285-1286. "The theory underlying the exception for vehicles is that the vehicle is 'being used for transportation.'" *Id.* at 1286 (quoting *Carney*, 471 U.S. at 394, 105 S. Ct. 2066). "Put another way, a public parking lot is typically an interim destination, but a home's driveway is often the end of that day's travels." *Id.* "We recognize that police might anticipate finding an automobile at a suspect's home." *Id.* "However, permitting the exception to apply where the vehicle may be expected to be found would open the door to warrantless searches where there is no reason to avoid the judicial oversight contemplated by the Fourth Amendment." *Id.*

[21] The Indiana Supreme Court has held:

> In light of the Supreme Court's recent emphatic statement in [*Maryland v.*] *Dyson* that the automobile exception "does not have a separate exigency requirement," 527 U.S. [465,] 467, 119 S. Ct. [2013,] 2014 [(1999)], we conclude that this exception to the warrant requirement under the Fourth Amendment does not require any additional consideration of the likelihood, under the circumstances, of a vehicle being driven away. Rather, we understand the "ready mobility" requirement of the automobile exception to mean that all operational, or potentially operational, motor vehicles are inherently mobile, and thus a vehicle that is temporarily in police control or otherwise confined is generally considered to be readily mobile and subject to the automobile exception to the warrant requirement if probable cause is present.

> This broad understanding of "readily mobile" is also consistent with the recognition that, for Fourth Amendment purposes, an individual is deemed to have a reduced expectation of privacy in an automobile. *Labron*, 518 U.S. at 940, 116 S. Ct. at 2487, 135 L.Ed.2d at 1036; *Carney*, 471 U.S. at 393, 105 S. Ct. at 2070, 85 L.Ed.2d at 414.

*Myers v. State*, 839 N.E.2d 1146, 1152 (Ind. 2005). *See also Hobbs*, 933 N.E.2d at 1286 (holding that the "automobile exception does not require that there be an imminent possibility the vehicle may be driven away").

[22] Further, "[f]acts necessary to demonstrate the existence of probable cause for a warrantless search are not materially different from those which would authorize the issuance of a warrant if presented to a magistrate." *Meister*, 933 N.E.2d at 879 (quoting *Masterson v. State*, 843 N.E.2d 1001, 1004 (Ind. Ct. App. 2006), *trans. denied*). Probable cause to issue a search warrant exists where the facts and circumstances would lead a reasonably prudent person to believe that a search would uncover evidence of a crime. *Esquerdo v. State*, 640 N.E.2d 1023, 1029 (Ind. 1994).

[23] To the extent Baker argues that his pickup truck was found in a place regularly used for residential purposes, we disagree. The record reveals that Baker's vehicle was parked in the parking lot of the Extended Stay America. Unlike a private driveway, we cannot say that the parking lot here amounts to a place regularly used for residential purposes. *See United States v. Washburn*, 383 F.3d 638, 642 (7th Cir. 2004) ("We have always rejected the notion that a hotel occupant enjoys the same expectation of privacy in his car in the parking lot of

the hotel as he does in the room itself; the hotel parking lot is 'readily accessible to the public and not generally thought of as a place normally used as a residence.' *United States v. Foxworth*, 8 F.3d 540, 545 (7th Cir. 1993)[, *cert. denied*, 511 U.S. 1025, 114 S. Ct. 1414 (1994)] . . . . Neither [the defendant's] inaccessibility to his van nor its location in the hotel parking lot invalidates the district court's application of the automobile exception.") (citations omitted), *cert. denied*, 544 U.S. 963, 125 S. Ct. 1746 (2005); *United States v. Williams*, 124 F. App'x 885, 887 (5th Cir. 2005) (addressing an argument that the automobile exception did not apply; holding that, "[a]lthough some support exists for the proposition that the automobile exception does not apply when a vehicle is parked in the defendant's private driveway, [the defendant's] car was parked in an apartment complex parking lot, generally open to the public"; and affirming the denial of the defendant's motion to suppress); *Foxworth*, 8 F.3d at 545 ("The considerations underlying the automobile exception apply in this case. First, the police found the gray Chevrolet in the motel parking lot, a place readily accessible to the public and not generally thought of as a place normally used as a residence."); *United States v. Ervin*, 907 F.2d 1534, 1538-1539 (5th Cir. 1990) (observing that the defendant's "trailer falls squarely under *Carney*: (1) it was not parked in a place regularly used for residential purposes but in a motel parking lot; (2) [the defendant] and his wife were not occupying the trailer as a home; and (3) it was readily mobile" and concluding that, "under *Carney*, the automobile exception to the warrant requirement applies to the search of [the defendant's] trailer"); *see also Hobbs*, 933 N.E.2d at 1286 ("Because Hobbs's admittedly mobile vehicle was in the parking area of a restaurant, it was subject

to the automobile exception and no warrant was required to search the vehicle if the officers had probable cause to believe it contained evidence of a crime.").

[24] With respect to probable cause, Officer Owens deployed Jax to conduct an exterior sniff of the pickup truck, and Jax alerted to the presence of narcotics. "It is well settled that a dog sniff is not a search protected by the Fourth Amendment." *Hobbs*, 933 N.E.2d at 1286. Accordingly, no degree of suspicion is required to summon the canine unit to the scene to conduct an exterior sniff of the car or to conduct the sniff itself. *Id.* Further, prior to touching the truck, Officer Owens used a flashlight to look inside of the truck and observed a pipe used for smoking methamphetamine. Under these circumstances, we conclude that probable cause existed to believe the truck contained contraband or evidence of a crime. *See Myers*, 839 N.E.2d at 1152 (holding that the defendant's car was readily mobile and thus eligible for the automobile exception regardless of the fact that it may have been temporarily confined by physical circumstances including the position of a police vehicle blocking it from the rear and, "[b]ecause the positive narcotics dog response provided probable cause to search the readily mobile vehicle, the warrantless search of it was justified under the automobile exception").

[25] As noted earlier, the trial court did not explicitly rule on whether the automobile exception applied. To the extent that the trial court's comments suggest that the dog sniff resulted in an unreasonable delay, we disagree. In *Rodriguez v. United States*, 575 U.S. 348, 135 S. Ct. 1609 (2015), the United States Supreme Court addressed dog sniffs in the context of traffic stops. The

Court observed that "'[a] relatively brief encounter,' a routine traffic stop is 'more analogous to a so-called "*Terry* stop" . . . . than to a formal arrest.'" *Rodriguez*, 575 U.S. at 354, 135 S. Ct. at 1614 (citations omitted).  The Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."  *Id.* at 350, 135 S. Ct. at 1612.  The Court held that "[a] seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation."  *Id.* at 350-351, 135 S. Ct. at 1612 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834 (2005)).  The Court held that because addressing the infraction is the purpose of the stop, "it may 'last no longer than is necessary to effectuate th[at] purpose.'"  *Id.* at 354, 135 S. Ct. at 1614 (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319 (1983), and citing *Caballes*, 543 U.S. at 407, 125 S. Ct. 834).  The Court further held that "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Id.*  The Court observed that its decisions in *Caballes* and *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781 (2009), heed these constraints.  *Id.*  The Court stated:

> In [*Caballes* and *Johnson*], we concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention.  *Johnson*, 555 U.S. at 327-328, 129 S. Ct. 781 (questioning); *Caballes*, 543 U.S. at 406, 408, 125 S. Ct. 834 (dog sniff).  In *Caballes*, however, we cautioned that a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket.  543 U.S. at 407, 125 S. Ct. 834.  And

we repeated that admonition in *Johnson*: The seizure remains lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop." 555 U.S. at 333, 129 S. Ct. 781. *See also Muehler v. Mena*, 544 U.S. 93, 101, 125 S. Ct. 1465, 161 L.Ed.2d 299 (2005) (because unrelated inquiries did not "exten[d] the time [petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was required"). An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

*Id.* at 354-355, 135 S. Ct. at 1614-1615. The Court held that beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop which typically include checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* at 355, 135 S. Ct. at 1615. The Court held that the critical question is whether conducting the sniff prolongs or adds time to the stop. *Id.* at 357, 135 S. Ct. at 1616. This Court has previously held that the burden is on the State to show the time for the traffic stop was not increased due to a canine sniff. *Wells v. State*, 922 N.E.2d 697, 700 (Ind. Ct. App. 2010), *trans. denied.*

[26] The situation faced by Officer Szybowski involved Baker appearing to conceal his face and being evasive; Officer Szybowski discovering that the pickup truck was registered to Baker who had a warrant; Baker informing Officer Szybowski that he borrowed the vehicle from his friend, Jimmy; Officer Szybowski believing that the individual with whom he was talking did not look like the

individual pictured on the identification card provided by Baker; Officer Szybowski consulting with other officers regarding whether Baker matched the photo on the identification card he provided; and Officer Szybowski requesting an officer with a fingerprint scanner. The officers also interacted with Elizabeth who was associated with Baker and consented to a search of her bags in which officers discovered contraband. At approximately sixteen minutes and twenty seconds into the video recording taken from Officer Szybowski's body camera, Officer Owens informed Officer Szybowski that Jax alerted to the presence of narcotics on the truck. Under these circumstances, we conclude that the officers' actions were conducted in a manner that did not unreasonably prolong the stop.

B. *Article 1, Section 11*

[27] The State argues that the search of Baker's truck was permissible under the Indiana Constitution because police acted reasonably given that they had a high degree of concern that the truck contained narcotics, the search did not extend Baker's detention, and police had a high need to search his truck.

[28] Although its text mirrors the Fourth Amendment, we interpret Article 1, Section 11 of our Indiana Constitution separately and independently. *Robinson v. State*, 5 N.E.3d 362, 368 (Ind. 2014). "When a defendant raises a Section 11 claim, the State must show the police conduct 'was reasonable under the totality of the circumstances.'" *Id.* (quoting *State v. Washington*, 898 N.E.2d 1200, 1205-1206 (Ind. 2008), *reh'g denied*). Generally, "[w]e consider three

factors when evaluating reasonableness: '1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.'" *Id.* (quoting *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005)).

[29] The record reveals that Jax alerted to the presence of narcotics in the vehicle and Officer Owens observed a pipe used for smoking methamphetamine prior to touching the truck. We conclude that the degree of concern, suspicion, or knowledge that a violation had occurred was very high. Regarding the degree of intrusion, Baker informed Officer Szybowski that he was merely borrowing the truck from his friend, Jimmy. Further, the search of the vehicle, which was parked in a parking lot, occurred during the early morning hours and while Baker was already detained in a police vehicle. We also note that the search of the vehicle did not involve tearing apart the seats or ripping out the dashboard looking for hidden compartments. We cannot say the degree of intrusion was high. *See generally Myers*, 839 N.E.2d at 1154 (observing that "the present search occurred after midnight, making prompt access to a magistrate more difficult" and "the intrusion, at least as to public notice and embarrassment, was somewhat lessened because of the hour . . . ."); *Hardin v. State*, 148 N.E.3d 932, 946 (Ind. 2020) ("[T]he degree of that intrusion was lessened by the way officers conducted the search. Hardin does not argue that the officers searched his vehicle in an egregious manner as could've been the case if officers had torn apart his seats or ripped out his dashboard looking for hidden compartments.

Instead, the search appears to have been no more extensive than a visual inspection of the interior of the vehicle—something someone might do to find a credit card or french fry dropped between a seat and the center console. In addition to moderating the intrusion into Hardin's privacy, the officers did not intrude into his physical movements by searching his vehicle since he was already in police custody."), *cert. denied*, 141 S. Ct. 2468 (2021). With respect to the extent of law enforcement needs, Officer Szybowski testified that Baker "identified the fact that he was borrowing the vehicle from a friend, so who knows who has a key to it and who else is staying at the hotel has access to it." Transcript Volume II at 27. Accordingly, contrary to the dissent's suggestion, officers had some reason to believe that the vehicle was accessible by and/or capable of being moved by someone other than Baker. Under the totality of the circumstances, we conclude that the search of the truck was reasonable and did not violate Baker's rights under Article 1, Section 11 of the Indiana Constitution.

[30] To the extent Baker cites *Brown v. State*, 653 N.E.2d 77 (Ind. 1995), we find that case distinguishable. In *Brown*, police located the defendant's vehicle, which was a possible match to a vehicle seen exiting the parking lot of a shopping center which included a drug store that was robbed a day earlier. 653 N.E.2d at 78. A detective believed the car matched the description so he "impounded and 'inventory-searched' it" at 1:30 p.m. *Id.* at 79. On appeal, the Court observed in part that a day had passed since the robbery under investigation had occurred, the car was parked in a residential neighborhood, and the warrantless

inventory search was not permitted because the vehicle was not properly impounded. *Id.* at 80. Unlike in *Brown*, we are addressing the automobile exception, the search occurred during the early morning hours, the police had not impounded the vehicle, and the police canine alerted for the presence of narcotics. *See Myers*, 839 N.E.2d at 1154 (distinguishing *Brown* in part on the bases that "[t]he *Brown* search was done at mid-day, whereas the present search occurred after midnight, making prompt access to a magistrate more difficult," "[t]he vehicle in *Brown* was but a possible match to one seen leaving a scene of a robbery a day earlier," and "[w]hether it contained contraband was a matter of speculation and conjecture until after it was searched").

[31]  With respect to the dissent's reliance on *Brown*, we note that the Indiana Supreme Court has cautioned against reading the holding in *Brown* too broadly. In *Hardin*, the Indiana Supreme Court held:

> [P]rivacy interests in vehicles do not render them beyond the reach of reasonable police activity. Hardin relies on our statement that "Hoosiers regard their automobiles as private and cannot easily abide their uninvited intrusion" to argue for a high degree of intrusion here. *See Brown v. State*, 653 N.E.2d 77, 80 (Ind. 1995). But Hardin reads *Brown* too broadly in connection with this factor. We agree that Hoosiers regard vehicles as private areas not subject to random police rummaging. *See Taylor v. State*, 842 N.E.2d 327, 334 (Ind. 2006) ("Automobiles are among the 'effects' protected by Article 1, Section 11."). But that doesn't mean that vehicles are beyond the reach of reasonable law-enforcement activities. We've recognized that "[h]ouses and premises of citizens receive the highest protection," *Carpenter*, 18 N.E.3d at 1002 (citation omitted), yet they are not completely off limits to law enforcement. Read in

the proper context, *Brown* is more about low police suspicion or concern and a lack of law-enforcement needs (*Litchfield* factors one and three) than an overly excessive intrusion (this *Litchfield* factor). *Brown*, 653 N.E.2d at 80 (noting both the delay between when a similar-looking vehicle left a crime scene and when police found Brown's vehicle parked on a public street and searched it as well as the lack of need for an immediate, warrantless search). *See also Myers v. State*, 839 N.E.2d 1146, 1153-54 (Ind. 2005) (upholding a warrantless search of a vehicle and distinguishing *Brown* based in part on the low degree of suspicion that the vehicle searched in *Brown* contained contraband). Thus, while we continue to recognize that Hoosiers regard their vehicles as private, *Brown* does not provide an impenetrable shield for those vehicles.

148 N.E.3d at 945-946.

[32] In light of Indiana Supreme Court's statements in *Hardin* as well the high degree of concern, suspicion, or knowledge that a violation had occurred in the present case and the facts as detailed above, we are not persuaded that *Brown* requires suppression of the evidence here.

[33] For the foregoing reasons, we reverse the trial court's order granting Baker's motion to suppress and remand for proceedings consistent with this opinion.

[34] Reversed and remanded.

Kenworthy, J., concurs.

Mathias, J., dissents with opinion.

ATTORNEYS FOR APPELLANT

Theodore E. Rokita
Attorney General of Indiana

Caroline G. Templeton
Supervising Deputy Attorney General
Indianapolis, Indiana


ATTORNEY FOR APPELLEE

James D. Crum
Coots, Henke & Wheeler, P.C.
Carmel, Indiana

**Mathias, Judge, dissenting.**

Times have changed since 1995. I conclude that the search of Baker's vehicle violated his rights under Article 1, Section 11, and, therefore, I respectfully dissent.

First, with regard to the *Litchfield* factors as discussed by the majority, I agree that the officer's degree of concern, suspicion, or knowledge that a violation occurred was high. *See supra* at 29. However, I do not agree with the majority's analysis of the remaining *Litchfield* factors.

In *Brown v. State*, 653 N.E.2d 77, 80 (Ind. 1995), our supreme court declared, "[w]ith respect to automobiles generally, it may safely be said that Hoosiers regard their automobiles as private and cannot easily abide their uninvited intrusion." An officer's search of a private vehicle is a significant intrusion, even more so when the officer lacks a warrant to search. As the *Brown* Court observed, "[t]he existence of a valid warrant to search and seize provides a preeminent form of support for a determination that the state standard of probable cause and reasonableness was met." *Id.* at 79. The court then explained that

> [j]udicial approval makes it much more likely that the police are doing everything possible to make certain that the search is appropriate. Doing all that one can almost guarantees that one is behaving reasonably. When armed with probable cause, law enforcement officers are faced with a continuum of ostensibly reasonable activity, from doing nothing to search and seizure. Seeking a warrant is a means for them to reduce the risk that

their proposed intrusive activity will fall outside that continuum, and that evidence will have to be suppressed in court. In addition, the warrant provides the individual being searched with the comfort of knowing some official other than the police officer performing the search has determined its propriety. State judges and magistrates with authority to issue warrants have received full legal educations. They often have had considerable experience in the practice of law; they are subject to the Code of Judicial Conduct. Moreover, judges and magistrates are generally politically answerable to their communities in ways that law enforcement officers are not and judicial officials are, therefore, more likely to understand the general mores regarding reasonable behavior. This preference for warrants is based on the belief that a neutral and detached magistrate is more likely to be a fair evaluator of the relevant circumstances than the police officer actively involved in investigating a particular crime.

*Id.* at 80 (footnote omitted).

[38] In the nearly thirty years since *Brown*, advances in technology have made the process of obtaining a warrant significantly faster. At the suppression hearing, Officer Szybowski agreed that the "on-call process" allows officers to get a warrant "pretty quickly in today's day and age." Tr. p. 26. During argument at that hearing, the trial court observed that it could possibly take just fifteen minutes to get a warrant. *Id.* at 61. In its order granting the motion to suppress, the trial court stated that "in todays [sic] world, . . . a police officer need only email a written probable cause affidavit to an on-call prosecuting attorney who forwards the same to an on-call judge and a warrant issues within minutes." Appellant's App. p. 103. When we consider the reasonableness of the police conduct under the totality of the circumstances, particularly in evaluating the

extent of law enforcement needs, the fact that a warrant can now be obtained so quickly must be factored into our analysis.

[39] Here, Baker was handcuffed and in the backseat of a police vehicle. Before Baker was placed in the officer's vehicle, and during the pat-down search, Officer Szybowski removed the truck's keys from Baker's pocket. Thus, Baker was incapable of accessing or moving the vehicle, and there were no facts known to the officer from which he could have reasonably concluded that some other person nearby would have been able to access the vehicle. Importantly, there were also five Carmel police officers on the scene. The presence of five law enforcement officers was surely sufficient to ensure that the truck would not be accessed or moved in the time it would have taken to secure a warrant.

[40] Under the totality of these circumstances, I would conclude that it was unreasonable for the officers to perform a warrantless search of Baker's truck. For this reason, I would conclude that the warrantless search violated Article 1, Section 11, and would affirm the trial court's order granting Baker's motion to suppress.