


# IN THE

# Court of Appeals of Indiana

State of Indiana,

*Appellant*

v.

Dennis R. Poland, Jr.,

*Appellee*

---

September 30, 2025

Court of Appeals Case No.
24A-CR-2252

Appeal from the Franklin Circuit Court

The Honorable J. Steven Cox, Judge

Trial Court Cause No.
24C01-2212-F4-863

---

**Opinion by Judge Brown**
Judges Tavitas and Foley concur.

**Brown, Judge.**

[1] The State appeals the trial court's order granting a motion to suppress filed by Dennis R. Poland, Jr. We reverse.[1]

**Facts and Procedural History**

[2] At approximately 11:00 a.m. on April 5, 2022, Franklin County Sheriff's Deputy Jason Robinson responded to a report of an accident on U.S. 52. When he arrived at the scene, Deputy Robinson observed "a multivehicle accident" involving a red Dodge Ram, a white semitruck, and a dark colored truck, and determined that one female was deceased. Transcript Volume II at 6. Deputy Robinson observed that a male, later identified as Poland, was trapped inside the dark colored truck, which was "completely demolished," *id.* at 11, and Poland's body was "positioned over the passenger side, with his leg trapped under the driver's side steering column." *Id.* at 7. Deputy Robinson "tried to gather information on what happened." *Id.* at 8. After EMS and fire personnel arrived, Deputy Robinson assisted with attempting to remove Poland from the

[1] We held oral argument on August 29, 2025, at the Gainbridge Fieldhouse in Indianapolis. We thank Pacers Sports and Entertainment and the Gainbridge Fieldhouse staff for their warm welcome and hospitality. We thank all those who attended, especially the students and staff from Victory College Prep, Muncie Central High School, Purdue Polytechnic High School, Rooted School Indianapolis, Ben Davis High School, Arsenal Technical High School, Believe Circle City High School, and IU Robert H. McKinney School of Law for their respectful attention. We also thank counsel for traveling and for their well-prepared written and oral advocacy.

vehicle "so he could get proper care." *Id.* EMS transported Poland to a hospital in Batesville.

[3] Deputy Robinson spoke to the other drivers involved. The driver of the semitruck told him that the dark colored truck "came around the curve," "lost control and rammed him head on." *Id.* at 10. The semitruck driver mentioned his truck had a dash camera, and Deputy Robinson was able to review the footage at some point while he was still on the scene.[2] Deputy Robinson also spoke with the driver of the red vehicle who stated that the dark colored pickup truck "came around the curve, lost control," struck her vehicle, and then struck the semitruck. *Id.* at 12.

[4] The video from the dash camera showed the semitruck was behind the red Dodge Ram traveling westbound on U.S. 52, the dark colored pickup truck "came around the curve at what appear[ed] to be a high rate of speed," the driver was "having difficulty making that turn" and was "swerving in and out of the lane of traffic," he "lost control of the vehicle," and the truck "started

---

[2] On cross-examination of Deputy Robinson, the following exchange occurred:

> Q But you don't recall exactly when that video would have gotten to you?
> A No, I do not recall what time it was.
> Q But it was probably a few hours?
> A Most likely, yes. Because I do know he was, the semi driver explained the safety team is who had it, and they were coming from aways away. I want to say somewhere around Lawrenceburg, but that was a little bit of aways. I remember that.

Transcript Volume II at 14-15.

fishtailing and hit off of the red Dodge Ram and then hit the semi head on." *Id.* at 10-11.

[5] Due to the fatality, the Sheriff's Department called the Indiana State Police ("ISP") to conduct a reconstruction. Deputy Robinson spoke to the ISP Troopers briefly about what he knew and "they kind of took that from there." *Id.* at 13.

[6] ISP Trooper Daniel Elmore, who had training in OWI investigations and had conducted or been involved in hundreds of OWI investigations, arrived at the scene about one hour later at approximately 12:09 p.m. while "there was a lot of chaos going on at the scene." *Id.* at 33. Trooper Elmore and ISP Trooper Ben Basson conducted a general survey of the scene and observed a "skid mark tire mark" or "a yaw mark that was going left of center." *Id.* at 24. Trooper Elmore determined that the yaw mark indicated that the vehicle was "generally doing some type of yaw or slid completely usually out of control generally" and that "there was at least a portion of a vehicle at some point in time during that crash that was left of center of its driving lane." *Id.* at 26. After conducting the general survey and receiving information, Trooper Elmore was "pretty much in standby mode until the crash reconstructionist arrived."[3] *Id.*

---

[3] On cross-examination, Trooper Elmore indicated that the crash reconstructionist arrived "probably 15 or 20 minutes after my arrival." Transcript Volume II at 37. Defense counsel asked, "You said 15 or 20 minutes of the standby time you said." *Id.* Trooper Elmore answered affirmatively.

[7] Upon the arrival of the crash reconstructionist, law enforcement "started the conversations and divvying up different responsibilities." *Id.* Trooper Elmore "was asked to photograph the scene" and began doing so. *Id.* At some point, Trooper Elmore was asked to conduct a blood draw on Poland who had been transported to the hospital. When he left for the hospital, Trooper Elmore did not have any information on Poland's identity. While en route, Trooper Basson contacted him and informed him that Poland's identification had been found inside the vehicle.

[8] At 1:42 p.m., Trooper Elmore arrived at the hospital and explained to the desk clerk that he needed "to try to obtain a blood draw." *Id.* at 28. The clerk took Trooper Elmore back to the emergency room bay where Poland was being treated. Multiple medical personnel were "working feverishly to continue life saving procedures," and a helicopter was en route to airlift Poland to Cincinnati Hospital. *Id.* Trooper Elmore asked a nursing supervisor if Poland was unconscious and she indicated that he was. Trooper Elmore explained to her that he needed to obtain a blood draw and requested one, "there was a nurse that was actually working on a line in his right arm," and the nursing supervisor handed "the vials to her." *Id.* The nurse "drew the blood off the line she was working with" at 2:00 p.m. and handed the vials to Trooper Elmore who

completed a submission form titled "Indiana State Department of Toxicology" and "Toxicology Analysis Request Form."[4]  Exhibits Volume at 3.

[9]     On December 15, 2022, the State charged Poland with: Count I, operating a vehicle while intoxicated causing death as a level 4 felony; Count II, causing death when operating a vehicle while intoxicated as a level 4 felony; Count III, operating a vehicle while intoxicated causing serious bodily injury as a level 5 felony; Count IV, operating a vehicle while intoxicated causing serious bodily injury as a level 5 felony; and Count V, reckless homicide as a level 5 felony.[5]

[10]     On September 2, 2024, Poland filed a Motion to Suppress arguing that law enforcement officers illegally seized his blood without consent, probable cause, and/or a search warrant.  He argued that "the warrantless seizure and search violated [his] State and Federal constitutional rights to be free from unreasonable searches and seizures and/or violated I.C. 9-30-6-6."  Appellant's Appendix Volume II at 118.

---

[4] This form requested tests for "Alcohol" and "Drugs" and identified the type of case as a fatal crash. Exhibits Volume at 3.

[5] Count I referenced Ind. Code § 9-30-5-5(a)(2) and alleged that Poland operated "a vehicle with a Schedule II controlled substance or its metabolite in his blood, to-wit, fentanyl, norfentanyl, and/or oxycodone, causing the death of Makenzie Howell."  Appellant's Appendix Volume II at 14.  Count II referenced Ind. Code § 9-30-5-5(a)(3) and alleged that Poland operated "a vehicle while intoxicated, causing the death of Makenzie Howell."  *Id.* at 15.  Count III referenced Ind. Code § 9-30-5-4(a)(2) and alleged that Poland operated "a vehicle with a Schedule II controlled substance or metabolite in his blood, to wit: fentanyl, norfentanyl, and/or oxycodone, causing serious bodily injury to Kari Hogeback."  *Id.* at 16.  Count IV referenced Ind. Code § 9-30-5-4(a)(3) and alleged that Poland operated "a vehicle while intoxicated, causing serious bodily injury to Kari Hogeback."  *Id.* at 17.  Count V referenced Ind. Code § 35-42-1-5 and alleged that Poland "did unlawfully or recklessly kill Makenzie Howell."  *Id.* at 18.

At a hearing on the motion to suppress, the State presented the testimony of Deputy Robinson and Trooper Elmore. When asked why he did not obtain a warrant for Poland's blood, Trooper Elmore noted the "totality of the circumstances," "the heavy damage" on all the vehicles, "the skid marks, the yaw marks which were indicative of high speeds and reckless driving," his training and experience, the "exigent circumstances," the helicopter to Cincinnati, and Poland's unconsciousness. Transcript Volume II at 30.

On cross-examination, when asked why he did not "use that standby time to prepare a warrant if [he] knew [he] needed to get blood," Trooper Elmore answered, "At that point in time, I was not aware as to where the occupant had been taken to that I was even going to be getting blood. Nor had I been asked by the lead investigator to conduct that responsibility." *Id.* at 37. The court asked when probable cause developed to conduct a blood draw, and Trooper Elmore answered, "Between the time that I arrived at the scene and the time that I actually arrived at the hospital after being asked to conduct a blood draw, I guess you could count that whole amount of time as development of probable cause." *Id.* at 39.

After the parties rested, the prosecutor argued that exigent circumstances existed and stated:

> It wasn't until [Trooper Elmore] arrived at the hospital, saw that [Poland] was unconscious, unable to give him implied consent so that way he only had – that's when the exigency kind of kicks in because he didn't have enough time to get the warrant after he

> knew that he was unconscious, unable to actually give consent.
> He was receiving medical lifesaving medical care.

*Id.* at 56. The prosecutor also argued in part that "[t]he exigency, according to *Mitchell v. State*, exigency exists when blood alcohol evidence is dissipating . . . ." *Id.* at 58.

On September 11, 2024, the court entered an order granting the Motion to Suppress. On September 19, 2024, the State filed a notice of appeal.[6]

## Discussion

"In reviewing a trial court's motion to suppress, we determine whether the record discloses 'substantial evidence of probative value that supports the trial court's decision.'" *State v. Renzulli*, 958 N.E.2d 1143, 1146 (Ind. 2011) (quoting *State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006)). "We do not reweigh the evidence, but consider 'conflicting evidence most favorably to the trial court's ruling.'" *Id.* (quoting *Quirk*, 842 N.E.2d at 340). "When the State appeals from a negative judgment, as here, it 'must show that the trial court's ruling on the suppression motion was contrary to law.'" *Id.* (quoting *State v. Washington*, 898 N.E.2d 1200, 1203 (Ind. 2008), *reh'g denied*). "[T]he ultimate determination of

---

[6] On September 20, 2024, the State filed a Motion to Dismiss without Prejudice in the trial court asserting that it "intends to re-file the appropriate charges subsequent to resolution of the appeal." Appellant's Appendix Volume II at 131. On September 23, 2024, the trial court granted the State's motion.

the constitutionality of a search or seizure is a question of law that we consider de novo." *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014).

[16] On appeal, the State argues that: (I) the blood draw did not violate the Fourth Amendment; and (II) the blood draw did not violate Article 1, Section 11 of the Indiana Constitution.

[17] Before addressing the State's arguments, we note Indiana's implied consent statutes. "Indiana's implied consent statutes appear at Indiana Code chapters 9-30-6 and 9-30-7." *State v. Bisard*, 973 N.E.2d 1229, 1232 (Ind. Ct. App. 2012), *trans. denied*. "Like the rest of the nation, the policy behind our implied consent statutes is to keep roadways safe by removing the threat posed by the presence of drunk drivers." *Id.* (citing *Ruge v. Kovach*, 467 N.E.2d 673, 681 (Ind. 1984)). "To that end, the statutes facilitate the collection of evidence of a driver's intoxication." *Id.* "[T]he statute is 'designed as a tool to acquire evidence of blood alcohol content rather than as a device to exclude evidence.'" *Id.* (quoting *Abney v. State*, 821 N.E.2d 375, 379 (Ind. 2005)). "While there are two leading chapters in the Code on implied consent, they interact closely." *Id.* Ind. Code Chapter 9-30-6 is titled "Implied Consent; Administrative and Evidentiary Matters." Ind. Code Chapter 9-30-7 is titled "Implied Consent in Accidents Involving Serious Injury or Death."

[18] Ind. Code § 9-30-7-2 provides: "A person who operates a vehicle impliedly consents to submit to the portable breath test or chemical test under this chapter as a condition of operating a vehicle in Indiana. A person must submit to each

portable breath test or chemical test offered by a law enforcement officer under this chapter to comply with this chapter." Ind. Code § 9-30-7-3 provides:

> (a) A law enforcement officer shall offer a portable breath test or chemical test to any person who the officer has reason to believe operated a vehicle that was involved in a fatal accident[7] or an accident involving serious bodily injury. If:
>
> > (1) the results of a portable breath test indicate the presence of alcohol;
> >
> > (2) the results of a portable breath test do not indicate the presence of alcohol but the law enforcement officer has probable cause to believe the person is under the influence of a controlled substance or another drug; or
> >
> > (3) the person refuses to submit to a portable breath test;
>
> the law enforcement officer shall offer a chemical test to the person.
>
> (b) A law enforcement officer may offer a person more than one (1) portable breath test or chemical test under this section. However, all chemical tests must be administered within three (3) hours after the fatal accident or the accident involving serious bodily injury.
>
> (c) It is not necessary for a law enforcement officer to offer a portable breath test or chemical test to an unconscious person.

---

[7] Ind. Code § 9-30-7-1(b) provides: "As used in this chapter, 'fatal accident' means an accident, a collision, or other occurrence that involves at least one (1) vehicle and that results in: (1) death; or (2) bodily injury that gives a law enforcement officer reason to believe that the death of at least one (1) person is imminent."

In its brief, the State asserts that, "[a]s a backdrop, Indiana drivers impliedly consent to blood draws following an accident involving serious injury or death." Appellant's Brief at 13 (citing *Isley v. State*, 202 N.E.3d 1124, 1132 (Ind. Ct. App. 2023) (citing Ind. Code § 9-30-7-2), *trans. denied*;[8] and *Bisard*, 973 N.E.2d at 1231).[9] However, the State does not argue that reversal is warranted based on Ind. Code §§ 9-30-7-2 and 9-30-7-3. Rather, the State argues that "[a] warrantless search of one's person ordinarily must be supported by probable

[8] In *Isley*, the defendant argued that a blood draw, which occurred while she was conscious after a fatal accident, "was obtained in violation of her rights under the Fourth Amendment to the United States Constitution, Article 1, Section 11 of the Indiana Constitution, and Indiana's implied consent laws." 202 N.E.3d at 1128. Under the heading "Fourth Amendment," the Court did not mention Indiana's implied consent laws but ultimately concluded that "the totality of the circumstances shows that Isley voluntarily provided her consent." *Id.* at 1129-1130. Under the heading "Implied Consent Laws," the Court observed that Isley argued that "the blood draw results should be suppressed because her consent was improperly obtained under Indiana's implied consent laws." *Id.* at 1132. While the Court stated under that section that "Indiana drivers impliedly consent to blood draws following an accident involving serious injury or death. Ind. Code § 9-30-7-2," *id.*, the Court did not address any interplay between Indiana's implied consent statutes and the Fourth Amendment.

[9] In *Bisard*, Indianapolis Metropolitan Police Officer David Bisard had his blood drawn by a medical assistant after he consented and following an accident in which one person died and two people were seriously injured. 973 N.E.2d at 1229-1230. On appeal from the grant of a motion to suppress the evidence for purposes of DUI charges, this Court twice mentioned the Fourth Amendment. In the opening of the discussion section, the Court observed: "If a driver appears intoxicated, the Fourth Amendment would surely permit an officer with a search warrant to obtain a sample of breath or bodily substance for purposes of a chemical test." *Id.* at 1231. In that same section, the Court observed that implied consent statutes "have been repeatedly upheld against various constitutional claims. *See, e.g., Mackey v. Montrym*, 443 U.S. 1, 99 S. Ct. 2612, 61 L.Ed.2d 321 (1979) (suspension of driver's license for refusing to submit to breath testing without pre-suspension hearing did not violate Fourteenth Amendment due process rights); *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L.Ed.2d 908 (1966) (blood draw after accident did not violate Fourth Amendment protection from unreasonable search and seizure or Fifth Amendment privilege against self-incrimination); *Breithaupt v. Abram*, 352 U.S. 432, 77 S. Ct. 408, 1 L.Ed.2d 448 (1957) (blood draw from driver unconscious in hospital after fatal accident did not violate Fourteenth Amendment due process rights)." *Id.* at 1232.

cause," "[p]robable cause existed that [Poland] operated his vehicle while intoxicated," and exigent circumstances existed.[10]  *Id.* at 14, 16.

[20] While we acknowledge the implied consent statutes, we do not base our decision on the statutes.  Rather, we apply the analysis in *Mitchell v. Wisconsin*, 588 U.S. 840, 139 S. Ct. 2525 (2019).  In *Mitchell*, a plurality of the Supreme Court of the United States stated that its "decisions have not rested on the idea that these [implied consent] laws do what their popular name might seem to suggest—that is, create actual consent to all the searches they authorize" and, "[i]nstead, we have based our decisions on the precedent regarding the specific constitutional claims in each case, while keeping in mind the wider regulatory scheme developed over the years to combat drunk driving."[11]  *Mitchell*, 588 U.S. at 846, 139 S. Ct. at 2533.

I.    *Fourth Amendment*

[21] The State contends that the trial court erred in granting Poland's motion to suppress because the officer had probable cause to seize Poland's blood and exigent circumstances existed.  It argues that the exigency factors in *Mitchell*, which addressed unconscious drivers, were present in this case.  It also asserts

---

[10] During oral argument, the State's counsel referenced probable cause and stated that "the way that looks in this case is is there a fair probability that the police will find evidence of intoxication in Poland's blood." Oral Argument at 8:07-8:15.

[11] During the oral argument in the present case, the State's counsel indicated that the implied consent statute "does not drive the admissibility of this evidence.  What drives the admissibility of the evidence is the probable cause analysis and the exigent circumstances analysis, those Fourth Amendment questions.  The statutes are civil in nature and exist for other purposes."  Oral Argument at 13:40-14:00.

that the "trial court's expectation that the officer should have, during this preliminary stage of the accident investigation, obtained the warrant ignored the inherent complexity of fatal accidents recognized in *Schmerber* [*v. California*, 384 U.S. 757, 86 S. Ct. 1826 (1966)]." Appellant's Brief at 20.

[22] Poland argues that "the only basis for the blood draw was the fact of the accident itself, which Indiana courts have acknowledged to be insufficient." Appellee's Brief at 13 (citing *L.W. v. State*, 199 N.E.3d 1225, 1231 (Ind. Ct. App. 2022)).[12] He argues that a warrantless blood draw is "presumptively unreasonable unless supported by valid consent, probable cause with exigent circumstances, or a recognized exception to the warrant requirement." *Id.* at 14. With respect to the notion of collective information, Poland asserts that there is no evidence that Trooper Elmore "was acting on or in reliance of other information outside of his personal knowledge when he directed hospital staff to take Poland's blood." *Id.* at 16. As for exigent circumstances, Poland argues that they did not exist, that *Mitchell* does not create a blanket rule permitting warrantless blood draws in every case, and that the Court in *Missouri v. McNeely*, 569 U.S. 141, 133 S. Ct. 1552 (2013), "rejected a categorical rule that alcohol

---

[12] In *L.W.*, this Court addressed an accident involving a fatality and a juvenile who consented to a blood draw without being informed she had a right to consult with her mother. 199 N.E.3d at 1228. The Court observed "the State failed to present any evidence that Officer Fox observed signs of intoxication, whether from alcohol or controlled substances," and that the officer testified only that "he developed probable cause to believe L.W. 'was the driver of a vehicle involved in a fatal or near fatal crash.'" *Id.* at 1231. The Court concluded that the State did not have probable cause to believe evidence of intoxication existed and that the State's claim of exigent circumstances failed. *Id.* We note that the juvenile in *L.W.* was not unconscious and the Court did not discuss *Mitchell*.

dissipation alone justifies warrantless blood draws, emphasizing that officers must demonstrate specific exigent circumstances beyond normal metabolization." *Id.* at 11. He also asserts that, "post-*Mitchell*, the United States Supreme Court has not yet addressed whether the dissipation of controlled-substances constitutes an exigent circumstance." *Id.*

[23] The Fourth Amendment to the United States Constitution provides in part that "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. CONST. AMEND. IV. "Probable cause is 'not a high bar.'" *Hodges v. State*, 125 N.E.3d 578, 581-582 (Ind. 2019) (quoting *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090 (2014)). It "is cleared when the totality of the circumstances establishes 'a fair probability'—not proof or a prima facie showing—of criminal activity, contraband, or evidence of a crime." *Id.* at 582 (quoting *Illinois v. Gates*, 462 U.S. 213, 235, 238, 243 n.13, 103 S. Ct. 2317 (1983)). "Accordingly, probable cause does not establish guilt. In fact, innocent activity will often supply a basis for showing probable cause." *Id.* "The probable-cause standard is also 'a fluid concept.'" *Id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 370-371, 124 S. Ct. 795 (2003) (quoting *Gates*, 462 U.S. at 232, 103 S. Ct. 2317)). "It is 'not readily, or even usefully, reduced to a neat set of legal rules,' and it cannot be quantified into percentages." *Id.* (quoting *Pringle*, 540 U.S. at 371, 124 S. Ct. 795 (quoting *Gates*, 462 U.S. at 232, 103 S. Ct. 2317)). "This is because probable cause 'turn[s] on the assessment of probabilities in particular factual contexts,' and it

depends on the totality of the circumstances, viewed as a whole." *Id.* (quoting *Pringle*, 540 U.S. at 371, 124 S. Ct. 795 (quoting *Gates*, 462 U.S. at 232, 103 S. Ct. 2317)). When reviewing for probable cause, we "view the circumstances from the standpoint of an objectively reasonable police officer, keeping in mind that both inferences based on the officer's own experience and common-sense conclusions about human behavior may affect whether the officer had probable cause." *Id.* (quotations and citations omitted).

[24] "Under the collective-knowledge doctrine, an officer's personal knowledge of facts that establish the necessary suspicion may be imputed to another officer." *Miller v. State*, 188 N.E.3d 871, 876 (Ind. 2022) (citing in part *Benton v. State*, 273 Ind. 34, 38, 401 N.E.2d 697, 699 (1980) (addressing probable cause)). If the search is conducted without a warrant, the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies. *M.O. v. State*, 63 N.E.3d 329, 331 (Ind. 2016). One exception is the exigent circumstances exception which allows certain warrantless searches to prevent the imminent destruction of evidence. *Mitchell*, 588 U.S. at 847, 139 S. Ct. at 2533.

[25] In *Mitchell*, which involved a blood draw of an unconscious person that did not follow any accident, Justice Alito wrote for a plurality.[13] Law enforcement received a report that Gerald Mitchell appeared to be "very drunk, had climbed

---

[13] Chief Justice Roberts, Justice Breyer, and Justice Kavanaugh joined Justice Alito's opinion. As noted below, Justice Thomas concurred in the judgment.

into a van and driven off." 588 U.S. at 845, 139 S. Ct. at 2532. An officer found Mitchell wandering near a lake, stumbling, and slurring his words. *Id.* The officer gave Mitchell a preliminary breath test that registered a BAC level of 0.24%. *Id.* The officer arrested Mitchell for operating a vehicle while intoxicated and, as was standard practice, drove him to a police station for a more reliable breath test using better equipment. *Id.* At the station, Mitchell was too lethargic for a breath test, the officer drove him to a hospital for a blood test, and Mitchell lost consciousness on the ride. *Id.* Mitchell remained unconscious while the sample was taken, and analysis of his blood showed that his BAC was 0.222%. *Id.* The Supreme Court granted certiorari "to decide '[w]hether a statute authorizing a blood draw from an unconscious motorist provides an exception to the Fourth Amendment warrant requirement.'" *Id.* at 846, 139 S. Ct. at 2532 (quoting Petition for Certiorari at ii).

[26] In the opening paragraphs, the Court indicated that it considered "what police officers may do in a narrow but important category of cases: those in which the driver is unconscious and therefore cannot be given a breath test." *Id.* at 843, 139 S. Ct. at 2531. The Court held:

> In such cases, we hold, the exigent-circumstances rule almost always permits a blood test without a warrant. When a breath test is impossible, enforcement of the drunk-driving laws depends upon the administration of a blood test. And when a police officer encounters an unconscious driver, it is very likely that the driver would be taken to an emergency room and that his blood would be drawn for diagnostic purposes even if the police were not seeking BAC information. In addition, police officers most frequently come upon unconscious drivers when they report to

the scene of an accident, and under those circumstances, the officers' many responsibilities—such as attending to other injured drivers or passengers and preventing further accidents—may be incompatible with the procedures that would be required to obtain a warrant. Thus, when a driver is unconscious, the general rule is that a warrant is not needed.

*Id.* at 843-844, 139 S. Ct. at 2531.

[27] The Court observed that the implied consent law "deems drivers to have consented to breath or blood tests if an officer has reason to believe they have committed one of several drug- or alcohol-related offenses" and that one of the Wisconsin statutes provided that "[a] person who is unconscious or otherwise not capable of withdrawing consent is presumed not to have" withdrawn implied consent. *Id.* at 844-845, 139 S. Ct. at 2531-2532 (quoting Wis. Stat. § 343.305(3)(b) and citing Wis. Stat. §§ 343.305(3)(ar) 1-2). The Court noted: "Wisconsin also authorizes BAC testing of drivers involved in accidents that cause significant bodily harm, with or without probable cause of drunk driving. See Wis. Stat. § 343.305(3) 2 (2016). We do not address those provisions." *Id.* at 844 n.1, 139 S. Ct. at 2531 n.1.[14]

---

[14] While the Court in *Mitchell* noted that it did not address statutory provisions involving accidents that caused significant bodily harm, such as those involved in the present case, we still find *Mitchell* instructive. Subsequent to the *Mitchell* decision, the Supreme Court of Wisconsin held that "the incapacitated driver provision [was] unconstitutional beyond a reasonable doubt" and "[t]he provision's 'deemed' consent authorizes warrantless searches that do not fulfill any recognized exception to the warrant requirement and thus the provision violates the Fourth Amendment's proscription of unreasonable searches." *State v. Prado*, 960 N.W.2d 869, 881 (Wis. 2021).

[28]     It wrote:

> In considering Wisconsin's implied-consent law, we do not write on a blank slate. "Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply." *Birchfield* [*v. North Dakota*, 579 U.S. 438, 136 S. Ct. 2160, 2185 (2016)]. But our decisions have not rested on the idea that these laws do what their popular name might seem to suggest—that is, create actual consent to all the searches they authorize. Instead, we have based our decisions on the precedent regarding the specific constitutional claims in each case, while keeping in mind the wider regulatory scheme developed over the years to combat drunk driving. That scheme is centered on legally specified BAC limits for drivers—limits enforced by the BAC tests promoted by implied-consent laws.

*Id.* at 846-847, 139 S. Ct. at 2532-2533.

[29]     The Court "address[ed] how the [exigent-circumstances exception to the warrant requirement] bears on the category of cases . . . involving unconscious drivers." *Id.* at 849-850, 139 S. Ct. at 2534-2535 (footnote omitted). It held that, "[i]n those cases, the need for a blood test is compelling, and an officer's duty to attend to more pressing needs may leave no time to seek a warrant." *Id.* at 850-851, 139 S. Ct. at 2535.

[30]     The Court emphasized the importance of the needs served by BAC testing. *Id.* at 851, 139 S. Ct. at 2535-2536. With respect to the dissipation of evidence in the blood, the Court stated:

> Enforcement of BAC limits also requires prompt testing because it is "a biological certainty" that "[a]lcohol dissipates from the bloodstream at a rate of 0.01 percent to 0.025 percent per hour. . . . Evidence is literally disappearing by the minute." *McNeely*, 569 U.S., at 169, 133 S. Ct. 1552 (opinion of ROBERTS, C.J.).

*Id.* at 852, 139 S. Ct. at 2536.

[31]　As for unconscious persons, the Court observed:

> [W]hen a breath test is unavailable to promote those interests, "a blood draw becomes necessary." *McNeely*, 569 U.S., at 170, 133 S. Ct. 1552 (opinion of ROBERTS, C.J.). Thus, in the case of unconscious drivers, who cannot blow into a breathalyzer, blood tests are essential for achieving the compelling interests described above.
>
> Indeed, not only is the link to pressing interests here tighter; the interests themselves are greater: Drivers who are drunk enough to pass out at the wheel or soon afterward pose a much greater risk. It would be perverse if the more wanton behavior were rewarded—if the more harrowing threat were harder to punish.
>
> For these reasons, there clearly is a "compelling need" for a blood test of drunk-driving suspects whose condition deprives officials of a reasonable opportunity to conduct a breath test. *Id.*, at 149, 133 S. Ct. 1552 (opinion of the Court) (internal quotation marks omitted). The only question left, under our exigency doctrine, is whether this compelling need justifies a warrantless search because there is, furthermore, "'no time to secure a warrant.'" *Ibid.*

*Id.* at 853, 139 S. Ct. at 2536-2537.

[32]　The Court held:

We held that there was no time to secure a warrant before a blood test of a drunk-driving suspect in *Schmerber* because the officer there could "reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." 384 U.S., at 770, 86 S. Ct. 1826 (internal quotation marks omitted). So even if the constant dissipation of BAC evidence *alone* does not create an exigency, see *McNeely*, *supra*, at 150-151, 133 S. Ct. 1552, *Schmerber* shows that it does so when combined with other pressing needs:

> "We are told that [1] the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where [2] time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case [without a warrant] was . . . appropriate . . . ." 384 U.S., at 770-771, 86 S. Ct. 1826.

Thus, exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application. Both conditions are met when a drunk-driving suspect is unconscious, so *Schmerber* controls: With such suspects, too, a warrantless blood draw is lawful.

*Id.* at 853-854, 139 S. Ct. at 2537.

[33] It explained:

> In *Schmerber*, the extra factor giving rise to urgent needs that would only add to the delay caused by a warrant application was a car accident; here it is the driver's unconsciousness. Indeed,

unconsciousness does not just create pressing needs; it is *itself* a medical emergency. It means that the suspect will have to be rushed to the hospital or similar facility not just for the blood test itself but for urgent medical care. Police can reasonably anticipate that such a driver might require monitoring, positioning, and support on the way to the hospital; that his blood may be drawn anyway, for diagnostic purposes, immediately on arrival; and that immediate medical treatment could delay (or otherwise distort the results of) a blood draw conducted later, upon receipt of a warrant, thus reducing its evidentiary value. See *McNeely*, *supra*, at 156, 133 S. Ct. 1552 (plurality opinion). All of that sets this case apart from the uncomplicated drunk-driving scenarios addressed in *McNeely*. Just as the ramifications of a car accident pushed *Schmerber* over the line into exigency, so does the condition of an unconscious driver bring his blood draw under the exception. In such a case, as in *Schmerber*, an officer could "reasonably have believed that he was confronted with an emergency." 384 U.S., at 770, 86 S. Ct. 1826.

Indeed, in many unconscious-driver cases, the exigency will be *more* acute, as elaborated in the briefing and argument in this case. A driver so drunk as to lose consciousness is quite likely to crash, especially if he passes out before managing to park. And then the accident might give officers a slew of urgent tasks beyond that of securing (and working around) medical care for the suspect. Police may have to ensure that others who are injured receive prompt medical attention; they may have to provide first aid themselves until medical personnel arrive at the scene. In some cases, they may have to deal with fatalities. They may have to preserve evidence at the scene and block or redirect traffic to prevent further accidents. These pressing matters, too, would require responsible officers to put off applying for a warrant, and that would only exacerbate the delay—and imprecision—of any subsequent BAC test.

In sum, all these rival priorities would put officers, who must often engage in a form of triage, to a dilemma. It would force them to choose between prioritizing a warrant application, to the detriment of critical health and safety needs, and delaying the warrant application, and thus the BAC test, to the detriment of its evidentiary value and all the compelling interests served by BAC limits. This is just the kind of scenario for which the exigency rule was born—just the kind of grim dilemma it lives to dissolve.

*Id.* at 854-856, 139 S. Ct. at 2537-2538 (footnotes omitted).

[34] The Court concluded:

When police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment. We do not rule out the possibility that in an unusual case a defendant would be able to show that his blood would not have been drawn if police had not been seeking BAC information, and that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties. Because Mitchell did not have a chance to attempt to make that showing, a remand for that purpose is necessary.

*Id.* at 857, 139 S. Ct. at 2539.[15]

---

[15] Justice Thomas concurred in the judgment and wrote:

We note that, not only was Poland unconscious as was the defendant in *Mitchell*, but officers were also confronted with an accident with injuries including a fatality, similar to the circumstances in *Schmerber*, which involved an accident involving injuries. With respect to exigent circumstances, Trooper Elmore arrived at the scene of the accident involving multiple vehicles more than an hour after Deputy Robinson responded and there was still "a lot of chaos going on at the scene." Transcript Volume II at 33. The video recording from the semitruck did not arrive at the scene for a period of time because "the semi driver explained the safety team . . . had it, and they were coming from aways away." *Id.* at 14-15. Trooper Elmore learned of Poland's identity after he was en route to the hospital. Two hours and forty-two minutes after the initial report of the accident, Trooper Elmore arrived at the hospital to obtain a blood draw from Poland. Multiple medical personnel were "working feverishly to continue life saving procedures," and a helicopter was en route to airlift Poland to Cincinnati Hospital. *Id.* at 28. The blood draw occurred at 2:00 p.m.

---

> Today, the plurality adopts a difficult-to-administer rule: Exigent circumstances are generally present when police encounter a person suspected of drunk driving—except when they aren't. The plurality's presumption will rarely be rebutted, but it will nevertheless burden both officers and courts who must attempt to apply it. "The better (and far simpler) way to resolve" this case is to apply "the *per se* rule" I proposed in *Missouri v. McNeely*, 569 U.S. 141, 133 S. Ct. 1552, 185 L.Ed.2d 696 (2013) (dissenting opinion). . . . Under that rule, the natural metabolization of alcohol in the blood stream "'creates an exigency once police have probable cause to believe the driver is drunk,'" regardless of whether the driver is conscious.

*Mitchell*, 588 U.S. at 858, 139 S. Ct. at 2539 (Thomas, J., concurring) (citations omitted). He also wrote that "[t]he Court has consistently held that police officers may perform searches without a warrant when destruction of evidence is a risk," "[t]he rule should be no different in drunk-driving cases," and "[b]ecause the plurality instead adopts a rule more likely to confuse than clarify, I concur only in the judgment." *Id.* at 861, 139 S. Ct. at 2541.

Court of Appeals of Indiana | Opinion 24A-CR-2252 | September 30, 2025          Page 23 of 29

or approximately three hours after law enforcement initially responded to the accident scene. The record indicates exigent circumstances existed.[16]

[36] As for probable cause, we cannot agree with Poland's argument that the only basis for the blood draw was the fact of the accident itself. The record reveals that the video showed Poland's pickup truck speeding, having difficulty making the turn, swerving, and losing control. Trooper Elmore testified that he had extensive field training including OWI investigations and OWI investigations involving crashes or fatalities. When asked how many OWI investigations he had conducted or been involved in, he answered, "Easily hundreds." *Id.* at 21. He indicated that the number of his investigations that involved crashes with fatalities was "[p]robably in the hundreds as well." *Id.* at 22. Trooper Elmore testified that he received training on the National Highway and Safety standards. When asked if "part of those standards that you've been trained on, do they say that loss of control, speed, swerving in and out of traffic, having difficulty going with the curve, and reckless driving are signs of impairment," Trooper Elmore answered affirmatively. *Id.* at 34. He discussed the heavy damage to the vehicles, the skid marks, and the yaw marks, and testified that he believed Poland was impaired. Under these specific circumstances, we

---

[16] To the extent that the parties discuss Ind. Code § 9-30-6-6, we note that Poland's counsel conceded at the oral argument that the statute "isn't necessarily a means to . . . suppress the blood but what I would say is that it's an example of why there's no exigent circumstances here." Oral Argument at 26:44-26:58. In light of that concession and our conclusion that exigent circumstances existed, we do not further address Ind. Code § 9-30-6-6.

conclude that law enforcement had probable cause to believe that Poland operated a vehicle while intoxicated.

[37] To the extent Poland argues that "post-*Mitchell*, the United States Supreme Court has not yet addressed whether the dissipation of controlled-substances constitutes an exigent circumstance," Appellant's Brief at 11, we note that there are many substances available for consumption by our populace that have a range of effects. The legislature has observed that numerous substances can result in intoxication. *See* Ind. Code § 9-13-2-86 (providing at the time of the accident in the present case that "'[i]ntoxicated' means under the influence of: (1) alcohol; (2) a controlled substance (as defined in IC 35-48-1); (3) a drug other than alcohol or a controlled substance; (4) a substance described in IC 35-46-6-2 or IC 35-46-6-3; (5) a combination of substances described in subdivisions (1) through (4); or (6) any other substance, not including food and food ingredients (as defined in IC 6-2.5-1-20), tobacco (as defined in IC 6-2.5-1-28), or a dietary supplement (as defined in IC 6-2.5-1-16); so that there is an impaired condition of thought and action and the loss of normal control of a person's faculties.") (Subsequently amended by Pub. L. No. 186-2025, § 82 (eff. July 1, 2025).[17] We hold that *Mitchell* extends to controlled substances. *See State v. McGee*, 959 N.W.2d 432, 439 (Iowa 2021) ("So the question we need to

---

[17] As noted, Counts I and III alleged that Poland operated a vehicle with a Schedule II controlled substance or its metabolite in his blood "to-wit, fentanyl, norfentanyl, and/or oxycodone." Appellant's Appendix Volume II at 14, 16. Counts II and IV alleged that Poland operated "a vehicle while intoxicated." *Id.* at 15, 17.

answer is whether *Mitchell* extends to controlled substances. We think it does."); *see also State v. McCall*, 839 S.E.2d 91, 92, 95-96 (S.C. 2020) (addressing a situation in which officers responded to an accident involving life-threatening injuries, the defendant denied drinking alcohol, and an officer believed he was impaired because his eyes were glassy and his pupils were dilated; discussing *Mitchell*; and holding that, "[w]ithout immediately knowing the substance's identity, officers could not possibly know how long it would remain in [the defendant's] blood, thus increasing the urgency"; and affirming the defendant's conviction because exigent circumstances justified the warrantless blood draw).

## II.    *Indiana Constitution*

[38]    To the extent the State argues that Poland waived his argument under Article I, Section 11 of the Indiana Constitution, we note that Poland's motion to suppress asserted that "the warrantless seizure and search violated [his] *State* and Federal constitutional rights to be free from unreasonable searches and seizures . . . ." Appellant's Appendix Volume II at 118 (emphasis added). Accordingly, we decline to find that Poland waived this argument.

[39]    Article 1, Section 11 of the Indiana Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

[40] "The legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). "[T]he totality of the circumstances requires consideration of both the degree of intrusion into the subject's ordinary activities and the basis upon which the officer selected the subject of the search or seizure." *Id.* at 360. Reasonableness of a search or seizure turns on the "balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs."[18] *Id.* at 361.

[41] With respect to the degree of concern, suspicion, or knowledge that a violation had occurred, the record reveals that law enforcement responded to an accident involving three vehicles with a deceased female and other injuries. A review of the dashcam video showed a pickup truck traveling at a high rate of speed on a curve, having difficulty making the turn, swerving in and out of the lane of

---

[18] This Court recently noted:

> [T]his court has expressed divergent views with respect to whether the *Litchfield* analysis is necessary where we find a valid exception to the warrant requirement. *See, e.g.*, *Isley v. State*, 202 N.E.3d 1124, 1134 (Ind. Ct. App. 2023) (May, J. concurring in part). As we have noted, the existence of valid consent does away with the need to determine whether a search is reasonable under either the federal or state constitutions. Accordingly, we do not undertake a *Litchfield* analysis here.

*Bauman v. State*, 207 N.E.3d 1249, 1256 n.9 (Ind. Ct. App. 2023), *trans. denied*. *Bauman* involved a conscious driver giving consent for a blood draw following an accident with an injury. *Id.* at 1252. Even if a *Litchfield* analysis applies when a valid exception to the warrant requirement exists, here *Litchfield* does not warrant suppression.

traffic, losing control, fishtailing, and colliding with other vehicles. Trooper Elmore, who had been involved in hundreds of OWI investigations, believed that the driver of the pickup truck was impaired. Accordingly, the degree of concern was high.

[42] Concerning the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, the record reveals that Poland was already at the hospital where the blood draw occurred, Trooper Elmore requested a blood draw from a nursing supervisor, "there was a nurse that was actually working on a line in his right arm," and the nurse "drew the blood off the line she was working with." Transcript Volume II at 28. At that time, Poland was unconscious. The degree of intrusion was minimal.

[43] As for the extent of law enforcement needs, law enforcement responded to the scene of the multi-vehicle accident where there was "chaos" more than an hour later. *Id.* at 33. The video from the semitruck did not arrive at the scene for a period of time. Two hours and forty-two minutes after the initial report, Trooper Elmore arrived at the hospital to obtain a blood draw from Poland. Multiple medical personnel were "working feverishly to continue life saving procedures," and a helicopter was en route to airlift Poland to Cincinnati Hospital. *Id.* at 28. The blood draw occurred at 2:00 p.m. or approximately three hours after law enforcement initially responded to the accident scene. The Indiana Supreme Court has observed that "few Hoosiers would dispute the heartbreaking effects of drunk driving in our state" and that "law enforcement has a strong interest in preventing . . . accidents" caused by impaired driving.

*Robinson v. State*, 5 N.E.3d 362, 368 (Ind. 2014). *See also Frensemeier v. State*, 849 N.E.2d 157, 164 (Ind. Ct. App. 2006) (addressing a defendant's claim that a blood draw violated Article 1, Section 11 of the Indiana Constitution, and observing that the law enforcement needs were great in this instance, given the desire to remove intoxicated drivers from our highways and the motor vehicle accident resulted in injuries to both drivers), *reh'g denied*, *trans. denied*. Under the totality of the circumstances, we conclude that the blood draw was reasonable and did not violate Poland's rights under Article 1, Section 11 of the Indiana Constitution.

[44] For the foregoing reasons, we reverse the trial court's grant of Poland's motion to suppress.

[45] Reversed.

Tavitas, J., and Foley, J., concur.

ATTORNEYS FOR APPELLANT

Theodore E. Rokita
Attorney General of Indiana

Jodi Kathryn Stein
Robert Yoke
Deputy Attorneys General
Indianapolis, Indiana


ATTORNEY FOR APPELLEE

Garrett R. Bascom
Bascom & Kisor LLC
Lawrenceburg, Indiana